Kerrie R. Heslin, Esq.
Kirsten McCaw Grossman, Esq.
Ryan S. Carlson, Esq.
NUKK-FREEMAN & CERRA, P.C.
26 Main Street, Suite 301
Chatham, New Jersey 07928
Tel.: (973) 665-9100
Fax: (973) 665-9101
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HEARTLAND PAYMENT SYSTEMS, LLC,<br><br>              Plaintiff,<br><br>v.<br><br>ROBERT O. CARR and KATHIE HANRATTY,<br><br>              Defendants. | **<u>COMPLAINT</u>**<br><br>Civil Action No.:<br><br>_____<br><br>Jury Trial Demanded |

Plaintiff Heartland Payment Systems, LLC ("HPS") whose principal place

of business is 3550 Lenox Road, Suite 3000, Atlanta, Georgia 30326, brings this

action against Defendants Robert O. Carr ("Carr"), who upon information and

belief resides at 82 Library Place, Princeton, New Jersey 08540, and Kathie

Hanratty ("Hanratty"), who upon information and belief resides at 319 Thomaston

Road, Unit 102, Watertown, Connecticut 06795.

## I.    INTRODUCTION AND NATURE OF THE ACTION

1.    Until April 22, 2016, Carr was the CEO of HPS and Chairman of HPS' Board of Directors.  In those roles, Carr owed HPS a fiduciary duty, as well as other common law duties of loyalty and honesty.  In addition, Carr was subject to the terms and provisions of his employment contract, as amended from time to time.

2.    Carr breached both his fiduciary duties and contractual obligations to HPS when he (i) improperly disclosed material, non-public information regarding Global Payment Inc.'s ("Global") potential acquisition of and offer to acquire HPS to his girlfriend, Kathie Hanratty; (ii) improperly engaged in insider trading by sending Hanratty funds to purchase HPS stock in advance of the public announcement that Global was acquiring HPS for a premium over HPS' then-share price and (iii) misrepresented to HPS and FINRA that he did not disclose any material, non-public information to Hanratty in an effort to conceal his unlawful insider trading.

3.    Through this action, HPS seeks to disgorge the illicit profits that Carr and Hanratty obtained through their insider trading scheme; to recover the monetary damages it suffered as a result of Carr's and Hanratty's unlawful conduct; and to obtain monetary and injunctive relief to remedy Carr's other

breaches, including Carr's breaches of his non-competition and non-solicitation covenants.

## II.  STATEMENT OF THE RELEVANT FACTS

### Carr's Insider Trading and
### Improper Disclosures of Material, Non-Public and Confidential Information

4.      In the fall of 2015, Global and HPS began communicating about the possibility of Global acquiring HPS.  Global's communications with HPS were through Carr.

5.      Before December 10, 2015 (the day rumors first circulated in news reports regarding Global's potential acquisition of HPS) and before December 15, 2015 (the day that Global and HPS publicly announced the acquisition), Global's interest in acquiring, and offer to acquire, HPS constituted material, non-public, and confidential information.

6.      Accordingly, Carr had a fiduciary and contractual duty to maintain Global's interest in and offer to acquire HPS strictly confidential until at least December 10, 2015.

7.      In breach of his fiduciary and contractual duties, Carr, before December 10, 2015, improperly disclosed Global's interest in and offer to acquire HPS to Hanratty, and improperly used that confidential information to personally benefit himself and Hanratty.

8.      Specifically, after improperly disclosing to Hanratty Global's interest in and offer to acquire HPS (including the specific offer amount), Carr caused Hanratty to purchase or, at a minimum, provided Hanratty with instructions and funds to purchase, HPS stock before December 10, 2015.  In an apparent attempt to try and hide their insider trading, Carr sent Hanratty funds to purchase the HPS stock in her own (and not Carr's) name.

9.      Through their unlawful insider trading, Carr and Hanratty obtained illicit profits from the increase in HPS' stock after the acquisition was publicly announced.  Specifically, at Carr's instruction, Hanratty purchased HPS' stock for roughly $79 per share (before the acquisition was announced publicly) and sold it only a few months later (after the acquisition was announced) for roughly $101 per share: a more than 25% gain.

10.     More specifically, Global and HPS executives agreed to meet on November 9, 2015 to discuss the contemplated acquisition.

11.     Although Global's meeting with HPS was confidential, at some point before November 9, 2015, Carr, in furtherance of his and Hanratty's insider trading scheme, improperly informed Hanratty of the meeting and Global's interest in acquiring Heartland.

12.     Indeed, at 7:15 a.m. on November 9, 2015, Hanratty emailed Carr to "[h]ave a good meeting with Global".  Exhibit A.  *See also* Exhibit B (Nov. 9, 2015 email from Hanratty to Carr asking "[h]ow was your meeting at Global?").

13.     Later that day, Carr sent Hanratty an email unequivocally disclosing to her the material, non-public and confidential information that Global had just offered $97.50 per share for HPS.  An image of that email is below and a true and correct copy of the email is attached at Exhibit B:

On Nov 9, 2015, at 6:47 PM, Carr, Robert O. <bob.carr@e-hps.com> wrote:

> Just landed back in Philadelphia.  Sweet girls, those lanes.   Meeting was good.  Price is $97.50 and closing would be late December.

14.     Hanratty replied: "Wow quite an offer."  *Id.*

15.     At the time of this email exchange (*i.e.*, on November 9, 2015), neither the fact that Global had offered to acquire HPS nor the price that Global offered for the acquisition were public information.  Rather, the information was material, non-public, and confidential.

16.     Carr, aided and abetted by Hanratty, used the material, non-public and confidential information to engage in unlawful insider trading.

17.     At some point between November 9 and November 16, 2015, Carr sent Hanratty an out-of-state check for her to deposit in a bank account in her name

and to then use the funds to purchase HPS stock before Global's acquisition of HPS was publicly announced.

18.     That scheme is shown, in part, by emails Carr and Hanratty exchanged on November 16 and 17, 2015.

19.     On November 16, 2015, Hanratty emailed Carr that she had "[m]ade arrangements with [her] bank to deposit the check and buy stock through their on line partner as soon as it clears in about 2 days."  An image of that email is copied below and a true and correct copy of the email is attached as Exhibit C.

-----Original Message-----
From: Kathie Hanratty [mailto:khanratty@jacicarroll.com]
Sent: Monday, November 16, 2015 12:35 PM
To: Carr, Robert O.
Subject:

Made deposit.
Going to get bacon for Ben for dinner preparations and then some walking in this glorious day Ps. Made arrangements with my bank to deposit the check and buy stock through their on line partner as soon as it clears in about 2 days.
Sent from my iPhone

20.     Carr responded to that email: "It is a really great day today!" *Id.*

21.     The next day, Hanratty emailed Carr to inform him that "**Arrangements are made to purchase the HPY stock as soon as the out of state check clears, <u>I am following your advice to the letter . . . .</u>"**[1]  An image of that email is below and a true and correct copy of the email is attached at Exhibit D.

---

[1] HPY was the ticker symbol for HPS.

-----Original Message-----
From: Kathie Hanratty [mailto:khanratty@jacicarroll.com]
Sent: Tuesday, November 17, 2015 5:01 PM
To: Carr, Robert O.
Subject: RE:

Safe journey to Plano
I went to the bank today and privately made the deposit (big gulp OMG) with the branch manager in
her office.  Arrangements are made to purchase the HPY stock  as soon as the out of state check clears.
I am following your advice to the letter and keeping the amount you suggested in a saving account for
now.  I have never felt so free from stress and worry  (that stuff you don't believe in LOL) in my entire
life.  Saying thank you is not enough but I am not sure what else to say.

22.     Carr responded to that email: "It's all good!"  *Id.*

23.     As of November 17, 2015, when the above email exchange occurred,

neither the fact that Global was offering to acquire HPS nor the amount of Global's

offer was public information.  Rather, it was material, non-public, and confidential

information that Carr was prohibited from using for his or anyone else's personal

benefit.

24.     The next day, Hanratty opened a new bank account, and named Carr

as the beneficiary of that account.

25.     Indeed, in a November 18, 2015 email Hanratty told Carr: "**I am at

the bank opening my account and I am making you the beneficiary . . . .**"  A

true and correct copy of this email exchange is attached hereto as Exhibit E.

26.     Later that same day, Hanratty informed Carr by email that she had

purchased HPS' stock: "I am a shareholder."  A true and correct copy of this email

exchange is attached hereto as Exhibit F.

27.    Carr responded: "Our stock closed at $79.27 today – thanks for buying :)! roc."[2]  *Id.*

28.    On November 18, 2015, Hanratty replied to Carr:

**The investment person from Webster called me as the broker bought 8500 shares and will get the remainder tomorrow.**

*Id.* (emphasis added).

29.    On November 23, 2015, roughly two weeks after Carr improperly disclosed to Hanratty Global's offer to acquire HPS for $97.50 per share, and roughly one week after Carr sent Hanratty money to purchase HPS' stock based on material, non-public, and confidential information, Hanratty sent Carr an email stating, in part: "**I will treat your gift with respect and not squander a penny but rather <u>I have done exactly what you recommended I do with it and made you the beneficiary of the account</u>.**"  A true and correct copy of this email is attached as Exhibit G.

30.    The next day, November 24, 2015, Carr again disclosed to Hanratty HPS' non-public, material, and confidential information.  Specifically, Carr emailed Hanratty: "Sounds good.  <u>**Just got the offer - $97.50.**</u>"  An image of that email is copied below and a true and correct copy of the email is attached as Exhibit H.

---

[2] "roc" are Carr's initials.

On Nov 24, 2015, at 5:01 PM, Carr, Robert O. <bob.carr@e-hps.com> wrote:

Sounds good.  Just got the offer - $97.50.  xoxo

31.    Hanratty responded to Carr's email: "Wonderful.  Remember Emmalee said $100 or nothing.  Lol".  *Id.*

32.    The email exchange referenced in Paragraphs 30 and 31 above demonstrates that Carr continued to knowingly breach his fiduciary duty to HPS, continued to improperly disclose HPS' material, non-public, and confidential information, and continued to use that information for his and Hanratty's personal benefit.

33.    On December 10, 2015, rumors of a potential Global acquisition of HPS first appeared in news reports.  On December 15, 2015, Global and HPS first publicly disclosed the Global/HPS transaction.[3]

34.    In short, after improperly disclosing to Hanratty that Global had initially offered $97.50 per share to acquire HPS on November 9, 2015, Carr sent Hanratty (at least) nearly one million dollars to purchase HPS stock at roughly $79 per share, all before the public announcement of Global's offer; *i.e.*, Carr and

---

[3] *See* https://www.businesswire.com/news/home/20151215006816/en/Global-Payments-Acquire-Heartland-Payment-Systems-4.3

9

Hanratty purchased HPS stock using material, non-public and confidential information.

35.     Carr's and Hanratty's unlawful scheme did not end there.  In early April 2016, Carr and Hanratty communicated regarding selling HPS' stock to monetize and maximize their illicit profits and to conceal their insider trading.  *See* Exs. I - L.

36.     On April 11, 2016, Hanratty emailed Carr that she is "meet[ing] with the person at Webster Bank Investments tomorrow.  Should I put in my sell order now or wait until next week?  Second question, how do I get the money to you or Peter to invest as we discussed this weekend.  I am not certain how to facilitate this."  A true and correct copy of that email is attached hereto as Exhibit I.

37.     At 6:50 a.m. the next day, April 12, 2016, Hanratty emailed Carr that she has "that meeting at the bank at 9am to sell my HPY stock . . . ."  A true and correct copy of that email is attached hereto as Exhibit J.

38.     At 9:13 a.m. that same day, Carr responded to Hanratty: "I am meeting with Peter today so let's discuss after that.  I can call you before I get on my flight tonight.  How much HPY stock would you be selling?"  A true and correct copy of that email is attached hereto as Exhibit K.

39.     Hanratty replied: "I have $1,156,814.00 in my account today at this very moment in stock and cash/dividends = 11,393 shares of HPY.  She has 2 proposals to review with me this morning that I haven't seen but my thought was to sell all of it and give to Peter to manage."  *Id.*

40.     Carr responded: "Have to say that I agree with you!"  *Id.*

41.     Later that same day, Hanratty emailed Carr again regarding the sale of HPS' stock writing: "Is there any reason I shouldn't sell today at [$]101.37 which is more than the [$]100 sale price".  Carr responded: "No reason at all".  An image of this email exchange is copied below and a true and correct copy of the email is attached as Exhibit L.

**From:** Carr, Robert O. [mailto:bob.carr@e-hps.com]
**Sent:** Tuesday, April 12, 2016 9:47 AM
**To:** Kathie Hanratty
**Subject:** Re: Call 212-288-1538 - to Set appointment with Dr Seinfeld - Bob and Dr. Seinfeld

No reason at all

Sent from my iPhone

On Apr 12, 2016, at 9:39 AM, Kathie Hanratty <khanratty@jacicarroll.com> wrote:

> Is there any reason I shouldn't sell today at 101.37 which is more than
> the 100 sale price
>
> Sent from my iPhone

42.     The $101.37 sales price is more than 25% higher than the roughly $79 per share Carr and Hanratty paid just a few months earlier.

## Carr's Misrepresentations to HPS and FINRA

43.     Carr knew that he had an obligation to neither disclose Global's offer to acquire HPS to Hanratty nor, having improperly disclosed material, non-public information, send Hanratty funds to purchase HPS stock or otherwise participate in or facilitate Hanratty's purchase of HPS stock.

44.     That knowledge is evidenced, in part, by Carr's efforts to conceal and hide his conduct from HPS and FINRA.

45.     In December 2015, and again in March 2016, FINRA contacted HPS to investigate trading in HPS stock during the weeks leading up to the December 15, 2015 public announcement of Global's acquisition of HPS.

46.     FINRA's initial December 2015 investigation required that HPS identify all individuals who had knowledge of the Global/HPS transaction before it was publicly announced on December 15, 2015.

47.     In response to FINRA's inquiry, Carr did not identify Hanratty as an individual who had prior knowledge of the Global/HPS transaction.

48.     Although Carr knew that he had disclosed non-public information regarding the Global/HPS transaction to Hanratty before December 15, 2015, Carr

failed to identify Hanratty even though (and likely because) he knew that HPS was seeking the information in order to respond to a FINRA investigation.

49.     Carr knowingly misrepresented the truth to HPS and FINRA when he failed to identify Hanratty as a person who had non-public knowledge of Global's offer to acquire HPS before December 15, 2015.

50.     Carr's failure to identify Hanratty violated Carr's contractual duties to HPS, as well as his fiduciary duty and duties of loyalty and honesty.

51.     In or about late March 2016, FINRA made a second inquiry with HPS regarding suspicious trades leading up to the public announcement of Global's acquisition of HPS.

52.     This time, FINRA provided HPS with the names of specific individuals of interest, including Hanratty, and asked HPS to (i) identify all individuals within HPS who knew the listed individuals; (ii) provide detailed information about the nature, history, and frequency of contact of those relationships; and (iii) identify the circumstances through which any of the listed persons may have gained non-public knowledge regarding Global's acquisition of HPS.

53.     HPS asked Carr to provide the company with the information requested in Paragraph 52 above so HPS could fully and truthfully respond to FINRA.

54.     In particular, and among other things, HPS asked Carr to provide information about his relationship with Hanratty and any instances in which he communicated with her regarding Global's acquisition of HPS before December 15, 2015.

55.     In response to the HPS' inquiry, Carr failed to provide truthful and complete information to HPS about his disclosures to Hanratty.

56.     Instead of fully and truthfully disclosing to HPS (and FINRA) his unlawful insider trading and improper disclosures of material, non-public, and confidential information to Hanratty, Carr falsely represented that he had not disclosed to Hanratty non-public information about Global's acquisition before December 15, 2015.

57.     Relying on Carr's representations, and unaware that Carr was concealing the truth, on April 21, 2016, HPS informed FINRA that Carr "did not discuss the HPY/GPN transaction with Ms. Hanratty prior to the December 15th Announcement" and he did "not know if Ms. Hanratty had knowledge or

awareness of the discussions between HPY and GPN, and, if so, how such knowledge or awareness was obtained."

58.    Carr's misrepresentations to HPS and FINRA about his disclosures to Hanratty were not an oversight or trivial omission.  Rather, they were intentional and designed to conceal the truth of his unlawful conduct from HPS and FINRA.

59.    Upon information and belief, Carr and Hanratty discussed their conspiracy and plan to cover-up their insider trading during a call they had had on or about April 20, 2016, as evidenced by the email exchange copied below:

---

**From:** Carr, Robert O. [mailto:bob.carr@e-hps.com]
**Sent:** Wednesday, April 20, 2016 5:01 PM
**To:** Kathie Hanratty
**Subject:** RE: VW to pay US customers $5,000 each to settle emissions scandal

Financial Industry Regulatory Authority – they are investigating about 100 people who purchased shares before the announcement of the Global-HPY merger.

---

**From:** Kathie Hanratty [mailto:khanratty@jacicarroll.com]
**Sent:** Wednesday, April 20, 2016 3:55 PM
**To:** Carr, Robert O.
**Subject:** RE: VW to pay US customers $5,000 each to settle emissions scandal

Okay.  I will be home by then.
What is Finra?

---

**From:** Carr, Robert O. [mailto:bob.carr@e-hps.com]
**Sent:** Wednesday, April 20, 2016 3:53 PM
**To:** Kathie Hanratty
**Subject:** RE: VW to pay US customers $5,000 each to settle emissions scandal

Thx.  We need to chat tonight – about FINRA.  FINRA is researching stock purchases prior to Dec 15th.  When is a good time to call you – it needs to be after 8pm.

---

A true and correct copy of this email is attached hereto as Exhibit M.

60.     Carr sent the April 20 email referenced above the day before HPS submitted its second "Review of Trading" report to FINRA.

61.     Carr's misrepresentations to HPS and FINRA constituted a breach of Carr's contractual duties to HPS, as well as a breach of his fiduciary duty and common law duties of loyalty and honesty.

## III.   PARTIES, JURISDICTION AND VENUE

62.     HPS is a limited liability company organized and existing under the laws of the State of Delaware.[4]  HPS' principal place of business is currently located at 3550 Lenox Road, Suite 3000, Atlanta, Georgia 30326.

63.     HPS' sole member is Global.  Global is a Georgia corporation with its principal place of business located at 3550 Lenox Road, Suite 3000, Atlanta, Georgia 30326.

64.     Before being acquired by Global, HPS was a publicly-traded company.  HPS traded under the ticker symbol HPY on the New York Stock Exchange.

-------

[4] The company Carr founded was Heartland Payment Systems, Inc.  That entity was merged into Plaintiff Heartland Payment Systems, LLC as part of the merger with Global.  Heartland Payment Systems, Inc. no longer exists as a separate corporate entity.  Throughout this Complaint, HPS refers to Heartland Payment Systems, Inc. before the merger and Heartland Payment Systems, LLC after the merger.

65.     Both before and after being acquired by Global, HPS operated as a nationwide provider of electronic payment processing services; *i.e.*, HPS provides merchants with products and services that assist merchants in accepting debit, credit, and similar cards as forms of payment.  Among other things, HPS facilitates electronic payment transactions by transmitting debit and credit card information from merchants to credit card networks, such as the VISA network.  HPS also assists banks and merchants in transferring funds relating to purchases and refunds and leases and sells products relating to electronic processing, such as point-of-sale terminals.

66.     In April 2016, Heartland Payment Systems, Inc. merged with HPS. By and through that merger, HPS has obtained all of Heartland Payment Systems, Inc.'s rights and claims, including, but not limited to, the rights and claims under Carr's Agreement[5] and the right to assert claims against Carr for any breaches of his fiduciary duty.  *See* Ex. N Section 10(g) ("The Company may assign any of its rights under this Agreement to any successor entity to the Company, including, but not limited to, any entity formed by the Company to carry on the business of the Company.").

---

[5] Throughout this Complaint, "Agreement" refers to Carr's May 4, 2007 Amended and Restated Employee Confidential Information and Noncompetition Agreement, as amended. *See infra ¶¶* 152-53.

67.     Defendant Carr is an individual who, upon information and belief, resides at 82 Library Place, Princeton, New Jersey 08540.  Upon information and belief, Carr has resided in Princeton, New Jersey from at least November 2015 to the present.

68.     When Carr breached his fiduciary duty to HPS, breached his contractual duty to maintain the confidentiality of HPS' confidential information, and breached his contractual obligations to HPS, Carr resided in New Jersey.

69.     Additionally, during relevant time periods when Carr breached his duties to HPS, HPS conducted business in New Jersey and had its principal place of business at 90 Nassau Street, Princeton, New Jersey 08542.

70.     Carr improperly disclosed and used HPS' confidential information, including material, non-public information relating to Global's acquisition of HPS, while he was in New Jersey.

71.     Carr improperly disclosed and used HPS' confidential information, including material, non-public, and confidential information relating to Global's acquisition of HPS, using a New Jersey telephone number and/or in emails he sent from New Jersey.

72.     Carr exchanged emails and telephone calls with Hanratty in furtherance of his breaches of fiduciary duty and contract while he was in New Jersey.

73.     In his Agreement, Carr expressly consented to jurisdiction and venue in this Court.  Specifically, Section 10(d) of Carr's Agreement states:

> Any suit, action or proceeding arising out of or relating to this Agreement shall be brought only in the Superior Court in the County of Mercer, New Jersey or the United States District Court for the District of New Jersey, and Employee hereby agrees and consents to the personal and exclusive jurisdiction of said courts over him or her as to all suits, actions and proceedings arising out of or related to this Agreement, and Employee further waives any claim that such suit, action or proceeding is brought in an improper or inconvenient forum.

*See* Ex. N at Section 10(d).

74.     Defendant Hanratty is an individual who, upon information and belief, resides at 319 Thomaston Road, Unit 102, Watertown, Connecticut 06795-2054.

75.     Hanratty communicated and conspired with Carr, and aided and abetted Carr's breaches of fiduciary duty, while Carr was in New Jersey.

76.     In particular, while Carr was in New Jersey, Hanratty communicated and conspired with Carr via telephone and/or email regarding Global's offer to acquire HPS, purchasing HPS stock, the status of Global's acquisition of HPS, selling HPS stock, and FINRA's investigation into Carr's and Hanratty's purchase of HPS stock.

77.    In addition, Hanratty was physically present (and with Carr) in New Jersey on numerous occasions between November 1, 2015 and December 15, 2015.  Upon information and belief, while Hanratty was in New Jersey with Carr they discussed Global's offer to acquire HPS, purchasing HPS stock and/or the status of Global's acquisition of HPS.  Upon information and belief, Hanratty was also physically present (and with Carr) in New Jersey when they discussed concealing their insider trading from HPS and FINRA.

78.    Carr's breaches of his fiduciary duty, and Hanratty's aiding and abetting Carr's breaches of fiduciary duty, were directed toward HPS, a company that, at the time, maintained its principal place of business in New Jersey.

79.    Carr's breaches of his fiduciary duty, and Hanratty's aiding and abetting Carr's breaches of fiduciary duty, injured HPS in at least New Jersey and Delaware.

80.    Upon information and belief, Carr sent or caused to be sent from New Jersey the funds that he provided to Hanratty to purchase HPS stock.  Similarly, the funds that Hanratty received from Carr to purchase HPS stock were sent or caused to be sent from New Jersey.

81.    Hanratty was aware that Carr was taking action in furtherance of their unlawful conspiracy to engage in insider trading while he was present in New Jersey.

82.    Carr's conduct and actions in New Jersey, as they relate to the insider trading allegations alleged herein, can also be attributable to Hanratty.

83.    This Court possesses subject matter jurisdiction over this dispute under Carr's Agreement and 28 U.S.C. § 1332(a).

84.    Complete diversity exists because Carr is a citizen of New Jersey, Hanratty is a citizen of Connecticut, and HPS is a citizen of Georgia (at the time of Carr's breaches of fiduciary duty, HPS' predecessor was a Delaware corporation); *i.e.*, neither Defendant currently resides in the same state as Plaintiff.

85.    Through this Complaint, HPS seeks, among other things, (i) disgorgement of the illicit profits Carr and Hanratty obtained through their unlawful insider trading; (ii) return of Carr's 2015 and 2016 compensation; (iii) monetary damages; and (iv) an injunction requiring Carr to comply with the terms of his contracts with HPS moving forward.

86.    Accordingly, the amount-in-controversy requirement exceeds $75,000, exclusive of interest and costs.

87.     With respect to Carr's breaches of fiduciary duty and Hanratty's aiding and abetting Carr's breaches of fiduciary duty, Delaware law applies under, among other things, the internal affairs doctrine.

88.     With respect to Carr's breaches of his Agreement, New Jersey law applies.  *See* Ex. N at Section 10(b).

## COUNT ONE – BREACH OF FIDUCIARY DUTY
## (AGAINST DEFENDANT CARR) (DELAWARE LAW)

89.     HPS repeats and re-alleges Paragraphs 1 through 88 above as if fully stated herein.

90.     From October 2000 until April 22, 2016, Carr served as HPS' CEO and as Chairman of HPS' Board of Directors.

91.     As HPS' Chairman and CEO, Carr owed HPS a fiduciary duty.

92.     Carr and HPS maintained a relationship of trust and confidence.

93.     As HPS' Chairman and CEO, Carr was required to maintain the confidentiality of HPS' confidential information.

94.     As HPS' Chairman and CEO, Carr had a fiduciary duty not to buy or sell HPS' stock, or tip another person to buy or sell HPS' stock, based on material, non-public information.

95.     Carr had a fiduciary duty not to use HPS' material, non-public, and confidential information to personally benefit himself, Hanratty, or others.

96.     Carr also had a duty to comply with HPS' insider trading policy, which prohibited Carr from "trading in securities . . . based on knowledge that comes from [his] job[], when that information is not known to the public" and from "giv[ing] tips to others which allow them to trade securities and property using such 'insider information'."

97.     As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr improperly disclosed HPS' material, non-public, and confidential information to Hanratty and improperly used that information for his and Hanratty's personal benefit.   In particular, Carr improperly disclosed to Hanratty and improperly used for his and Hanratty's personal benefit the following material information before it was publicly available and at a time when Carr had a fiduciary duty to maintain its confidence:

     a.     Global's interest in acquiring HPS;

     b.     Global's initial offer to acquire HPS for $97.50/share;

     c.     The initial targeted closing date for the acquisition; and

     d.     Global's subsequent offer to acquire HPS for $97.50/share.

*See* Exs. A-L.

98.     By improperly disclosing and using HPS' material, non-public, and confidential information to Hanratty and others, Carr breached his fiduciary duty to HPS.

99.     After improperly disclosing material, non-public information about Global's interest in and offer to acquire HPS, Carr, aided and abetted by Hanratty, engaged in unlawful insider trading.

100.    As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr and Hanratty schemed and conspired to breach Carr's fiduciary duty to HPS and to engage in insider trading by:

      a.   Carr tipping and otherwise providing Hanratty with material, non-public and confidential information about HPS (*i.e.*, details about the timing and amount of Global's offer to acquire HPS) to be used in making securities transactions;

      b.   Carr sending Hanratty an out-of-state check for the purpose of using the funds to purchase HPS stock before Global's acquisition of HPS stock was publicly announced; and

      c.   Hanratty, with Carr's participation, funding and facilitation, using HPS' material, non-public and confidential information in purchasing HPS stock before the public announcement of Global's acquisition of HPS.

*See* Exs. A-L.

101.    Each of the actions described in Paragraph 100 above constituted a breach of Carr's fiduciary duty to HPS.

102.   After his November 9, 2015 meeting with Global during which Global informed Carr of the $97.50 offer to acquire HPS, but before December 10, 2015, when rumors of Global's potential acquisition of HPS first appeared in news reports, Carr sent Hanratty a check with the intention that some or all of the funds would be used to purchase HPS stock.  At a minimum, Carr knew that Hanratty was using the funds to purchase HPS stock with knowledge of material, non-public and confidential information he had provided her.

103.   After his November 9, 2015 meeting with Global during which Global informed Carr of the $97.50 offer to acquire HPS, but before the December 10, 2015 rumors in news reports and the December 15, 2015 public announcement of Global's agreement to acquire HPS, Carr advised and instructed Hanratty regarding how to set up a brokerage account for the purpose of purchasing HPS stock.

104.   Hanratty purchased HPS stock on or about November 18, 2015.

105.   The HPS stock that Hanratty purchased on or about November 18, 2015, was purchased, in whole or in part, with funds that she received from Carr in November 2015.

106.   Hanratty's purchase of HPS stock in or around November 18, 2015, personally benefitted herself and/or Carr.

107.   Carr used HPS' material, non-public information to make or cause to be made securities transactions that were motivated, in whole or in part, by the substance of that information.

108.   Carr retained a beneficial interest in the proceeds of the unlawful insider trading given that Hanratty named him as the beneficiary of her brokerage/ investment account.  Carr also received non-monetary benefits from Hanratty as a result of their insider trading.

109.   In April 2016, Carr and Hanratty communicated regarding timing the sale of the HPS stock that Hanratty purchased (using Carr's funds) on or about November 18, 2015.

110.   On April 11-12, 2016, Carr communicated with Hanratty regarding whether she should sell the HPS stock she purchased (using Carr's funds) on or about November 18, 2015.

111.   On or around April 12, 2016, Hanratty sold the HPS stock that she purchased in November 2015 (using Carr's funds) for more than $101 per share.

112.   On or about April 20, 2016, Carr and Hanratty communicated about the fact that FINRA was investigating certain purchases of HPS stock in November 2015.

113.   On or about April 20, 2016, Carr and Hanratty communicated about the fact that the purchases of HPS stock in Hanratty's name in November 2015 were among the purchases about which FINRA was inquiring.

114.   Upon information and belief, on or around April 20, 2016, Carr and Hanratty communicated regarding representing to FINRA that they never discussed any non-public information about Global's acquisition of HPS.

115.   Carr represented to HPS that he never provided any non-public information about Global's acquisition of HPS to Hanratty.

116.   Carr's representation to HPS in Paragraph 115 was false.

117.   Carr misrepresented the truth, including through omission of material facts, during his responses to HPS in the course of HPS' preparation of its two response letters to FINRA.

118.   By using HPS' material, non-public, and confidential information to benefit himself and Hanratty, Carr breached his fiduciary duty to HPS.

119.   By providing false information to HPS in connection with FINRA's investigation into trading of HPS stock in the weeks leading up to the public announcement of Global's acquisition of HPS, Carr breached his fiduciary duty to HPS.

120.   Carr's breaches of his fiduciary duty to HPS caused HPS harm.

121.   Alternatively, even if HPS had not been harmed, HPS is permitted to bring a *Brophy* action against Carr for breaching his fiduciary duty by engaging in insider trading.  *See, e.g.*, *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949); *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

122.   HPS is entitled to disgorgement of any illicit profits that Carr and Hanratty obtained in connection with or through their improper and unlawful insider trading scheme.

123.   HPS is also entitled to recover from Carr all of the fees, costs and expenses it incurred as a result of Carr's unlawful conduct.

## COUNT TWO – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (AGAINST DEFENDANT HANRATTY) (DELAWARE LAW)

124.   HPS repeats and re-alleges Paragraphs 1 through 123 above as if fully stated herein.

125.   As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr improperly disclosed HPS' material, non-public, and confidential information to Hanratty and improperly used that information for his and Hanratty's personal benefit.   In particular, Carr improperly disclosed to Hanratty and improperly used for his and Hanratty's personal benefit the following material information before it was publicly available and at a time when Carr had a fiduciary duty to maintain its confidence:

     a.     Global's interest in acquiring HPS;

     b.     Global's initial offer to acquire HPS for $97.50/share;

     c.     The initial targeted signing date for the acquisition; and

     d.     Global's subsequent offer to acquire HPS for $97.50/share.

*See* Exs. A-L.

126.   After improperly disclosing material, non-public, and confidential information regarding Global's interest in and offer for HPS, Carr, knowingly aided and abetted by Hanratty, engaged in unlawful insider trading based on that information.

127.   The purpose of the conspiracy and scheme was to personally benefit Carr and Hanratty.

128.   As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr, knowingly aided and abetted by Hanratty, breached his fiduciary duty to HPS and engaged in insider trading by:

     a.     Carr tipping and otherwise providing Hanratty with material, non-public and confidential information about HPS (*i.e.*, details about the timing and amount of Global's offer to acquire HPS) to be used in making securities transactions;

     b.     Carr sending Hanratty an out-of-state check for the purpose of using the funds to purchase HPS stock before Global's acquisition of HPS stock was publicly announced; and

c.   Hanratty, with Carr's participation, funding and facilitation, using HPS' material, non-public and confidential information in purchasing HPS stock before the public announcement of Global's acquisition of HPS.

129.   Each of the actions described in Paragraph 128 above constituted a breach of Carr's fiduciary duty to HPS, which Hanratty knowingly aided and abetted.

130.   By using HPS' material, non-public, and confidential information to benefit himself and Hanratty, Carr breached his fiduciary duty to HPS, which Hanratty knowingly aided and abetted.

131.   Hanratty knowingly aided and abetted Carr in breaching his fiduciary duty to HPS by, among other things:

a.   Receiving funds from Carr with the intent and purpose of using such funds to purchase HPS securities using material, non-public and confidential information;

b.   Opening a bank account to hold some or all of the funds or HPS securities, with Carr being named as a beneficiary to that account; and

c.   Purchasing HPS stock at Carr's direction and relying upon Carr's disclosure of HPS' material, non-public and confidential information in making the purchase.

132.   After learning of Carr's November 9, 2015 meeting with Global and Global's $97.50/share offer, but before the December 10, 2015 rumors in news

reports and the December 15, 2015 public announcement of Global's offer to acquire HPS, Hanratty accepted a check from Carr with the intention that some or all of the funds would be used to purchase HPS stock.

133.    After learning of Global's November 9, 2015 meeting with Global and Global's $97.50/share offer, but before the December 10, 2015 rumors in news reports and the December 15, 2015 public announcement of Global's offer to acquire HPS, Hanratty, with and relying upon Carr's instruction and advice, set up a brokerage account for the purpose of purchasing HPS stock.

134.    Hanratty, in concert with Carr, purchased HPS stock on or about November 18, 2015.

135.    The HPS stock that Hanratty purchased on or about November 18, 2015, was purchased, in whole or in part, with funds that she received from Carr in November 2015.

136.    Carr retained a beneficial interest in the proceeds of the unlawful insider trading given that Hanratty named him as the beneficiary of her brokerage/investment account.  Hanartty also provided Carr with non-monetary benefits as a result of and in exchange for their insider trading.

137.   In April 2016, Carr and Hanratty communicated regarding timing the sale of the HPS stock that Hanratty purchased (using Carr's funds) on or about November 18, 2015.

138.   In April 2016, Hanratty, working in concert with Carr, sold the HPS stock she purchased (using Carr's funds) on or about November 18, 2015.

139.   On or about April, 20, 2016, Carr and Hanratty communicated about the fact that FINRA was investigating HPS stock purchases in November 2015.

140.   On or about April, 20, 2016, Carr and Hanratty communicated about the fact that Hanratty's purchase of HPS stock (using Carr's funds) in November 2015 was among the purchases that FINRA had inquired about.

141.   Upon information and belief, on or about April 20, 2016, Carr and Hanratty communicated regarding falsely representing to FINRA that they never discussed any non-public information regarding Global's acquisition of HPS.

142.   Through the actions cited above and others, Hanratty played a substantive and material role in aiding and abetting Carr's breaches of his fiduciary duty.

143.   Hanratty aided and abetted Carr in using HPS' material, non-public, and confidential information to make or cause to be made securities transactions that were motivated by the substance of the information.

144.    Upon information and belief, Hanratty further aided and abetted Carr's breaches of fiduciary duty by trying to conceal them from FINRA and others.

145.    Hanratty was a knowing participant in Carr's breaches of his fiduciary duty in that she knew, among other things, that she was (i) receiving non-public information from Carr; (ii) using such non-public information to purchase HPS stock (using Carr's funds); (iii) naming Carr as a beneficiary to the account; and (iv) upon information and belief, working in concert with Carr to conceal Carr's disclosure of non-public information and their purchase of HPS stock in reliance thereon.

146.    HPS has been harmed by Carr's breaches of his fiduciary duty, which Hanratty aided and abetted.

147.    Alternatively, even if HPS was not harmed, it is permitted to bring a *Brophy* action against Hanratty for aiding and abetting Carr in breaching his fiduciary duty.  *See, e.g.*, *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949); *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

148.    HPS is entitled to disgorgement of any illicit profits that Carr and Hanratty obtained through their improper and unlawful insider trading scheme.

149.   HPS is also entitled to recover from Hanratty all of the fees, costs and expenses it incurred as a result of Hanratty's conduct.

## COUNT THREE – BREACH OF CONTRACT
## (AGAINST DEFENDANT CARR) (NEW JERSEY LAW)

150.   HPS repeats and re-alleges Paragraphs 1 through 149 above as if fully stated herein.

151.   The electronic payment processing industry is highly competitive. Indeed, processing companies, like HPS, vigorously compete for merchants to use their processing services and to purchase or lease their processing equipment. Thus, the relationships and goodwill that HPS builds and maintains with its customer base are valuable assets, as are the relationships that HPS builds with its sales and other employees, who are critical to implementing the company's business plans and maintaining and expanding the company's customer base. Similarly, the confidential sales strategies, plans and practices that HPS uses to identify, market, solicit and maintain merchant customers are highly valuable to HPS.

152.   To preserve and protect its confidential information, goodwill, reputation, and business and employee relationships, on or about May 4, 2007, HPS required Carr to execute an Amended and Restated Employee Confidential

Information and Noncompetition Agreement, a true and correct copy of which is attached hereto as Exhibit N.

153.   On May 11, 2009, Carr signed Amendment No. 1 to Amended and Restated Employee Confidential Information and Noncompetition Agreement, a true and correct copy of which is attached hereto as Exhibit O.  That agreement, along with the May 4, 2007 agreement referenced in Paragraph 152 above, are referred to throughout this Complaint as the "Agreement."[6]

154.   The Agreement is intended to, among other things, preclude Carr from disclosing or misappropriating HPS' confidential information for his own benefit or for the benefit of any other person or entity.  The Agreement is also intended to protect HPS' goodwill, reputation, and relationships with its merchants and employees.

155.   Paragraph 4 of Carr's Agreement prohibits Carr from using or disclosing HPS' confidential information.  Ex. N ¶ 4.  Specifically, Paragraph 4 states:

> (a)   The Employee hereby covenants with Company that, throughout the term of his employment by the Company, Employee

---

[6] The May 4, 2007 agreement revoked and terminated a November 2001 Employee Confidential Information and Noncompetition Agreement.  *See* Ex. N at 1 ("the Company and Employee desire to revoke and terminate the Old Agreement and enter into this Agreement.").

will serve Company's best interests loyally and diligently. **Throughout the course of employment by Company and thereafter, Employee will not disclose to any person, firm, corporation or entity (except when expressly authorized in writing by Company) any information relating to Company's business,** including, without limitation, merchant application processing and credit underwriting software, merchant information systems, sales compensation and sales force automation software and systems, electronic payment transaction processing software, fraud and risk analysis systems, human resources and time and attendance information systems and software, payroll services information systems and payroll application processing software, sales policy documents, marketing communications materials, information relating to trade secrets, business methods, products, processes, procedures, development or experimental projects, suppliers, customer lists or the needs of customers or prospective customers, clients, etc., **and will not use such information for his own purpose or for the purpose of any person, firm, corporation or entity except the Company**.

*Id.* (emphasis added).

156.   Paragraph 5(a) of Carr's Agreement contains a non-compete covenant that prohibited Carr, for twelve months after leaving HPS (*i.e.*, until **April 22, 2017**), from, among other things, directly or indirectly "developing products or services which compete with the products or services marketed, sold or being developed" by HPS.  *Id.* ¶ 5(a).

157.   Specifically, Section 5(a) states:

During the Restricted Period (as defined below), **Employee will not (i) directly or indirectly engage in any business or activity which markets, sells or is developing products or services which compete with the products or services marketed, sold or being developed by the Company at the time of such termination** (such business or

activity being hereinafter sometimes called a "Competing Business"), in any country, state, territory, region or other geographic area, whether in the United States or otherwise, in which, at the time the Employee becomes no longer employed by the Company, the Company transacts business or sells or markets its products or services, whether such engagement by the Employee shall be as an officer, principal, agent, director, owner, employee, partner, affiliate, consultant or other participant in any Competing Business, or (ii) assist others in engaging in any Competing Business in any manner described in the foregoing clause (i).

*Id.* (emphasis added).

158.   The Agreement defines the "Restricted Period" as:

(c) "Restricted Period" shall mean the period commencing on the date hereof and ending on the last date of the twenty fourth (24th) full calendar month following the Employee's termination for any reason whatsoever including but not limited to involuntary termination (with or without Cause) and/or voluntary termination; provided that the Restricted Period shall be extended by any amount of time that the Employee has failed to comply with his promises contained in Section 5 of this Agreement; provided further that in the event of a Change in Control the Restricted Period shall mean the period commencing on the date hereof and ending on the last day of the twelfth (12th) full calendar month following the Employee's termination for any reason whatsoever including but not limited to involuntary termination (with or without Cause) and/or voluntary termination following a Change in Control.

Ex. N ¶ 5(c).

159.   Carr's Agreement also contains restrictive covenants that prohibit

him, for a period of twenty-four (24) months from the end of this employment (*i.e.*,

until April 22, **2018**), from inducing HPS employees to terminate their

employment with HPS or work for a competing business, such as Carr's new business Beyond.  Ex. N ¶ 6.  Specifically, Paragraph 6(b) states:

> (b)    **During the period commencing on the date hereof and ending on the last day of the twenty-fourth (24th) full calendar month following the Employee's termination** for any reason whatsoever, including but not limited to involuntary termination (with or without Cause) and/or voluntary termination, **the Employee will not, directly or indirectly, induce other employees of the Company to terminate their employment with the Company or engage in any Competing Business**.

*Id.* (emphasis added).

160.   The Agreement also prohibits Carr from soliciting HPS' merchants and vendors for a period of twelve months after his employment with HPS ends. *Id.* ¶ 6(a).

161.   By executing the Agreement, Carr acknowledged that the restrictive covenants (*i.e.*, the confidentiality, non-compete, and non-solicit covenants) do not "prevent him from earning a living" and that the compensation he received was sufficient consideration for the prohibitions contained within the restrictive covenants:

> The Employee understands that the foregoing restrictions may limit his ability to earn a livelihood in a business competitive to the business of the Company, but he nevertheless believes that **he has received and will receive sufficient consideration and other benefits in connection with the Company's issuance of certain stock and stock options to the Employee as well as other benefits to clearly justify such restrictions which, in any event (given his**

> **education, skills and ability), the Employee does not believe would prevent him from earning a living.**

*Id.* ¶ 5(b) (emphasis added).

162.   By executing the Agreement, Carr also acknowledged that the restrictive covenants contained therein are reasonable and necessary to protect HPS' legitimate business interests:

> The Employee acknowledges that the Company has expended considerable resources to develop the confidential information and the relationships that the Company enjoys with its customers, suppliers, employees, officers and other agents, and these assets of the Company are critical to the business of the Company. **The Employee agrees that the restrictions set forth below are necessary to prevent even the inadvertent disclosure of this confidential information or the interference with these relationships and to protect the legitimate business interests of the Company and are reasonable in scope and content**.

*Id.* ¶ 3(b) (emphasis added).

163.   Carr's Agreement with HPS is a valid and binding contract.

164.   HPS has materially performed its obligations under the Agreement.

165.   HPS, as the successor to Heartland Payment Systems, Inc., has the right to enforce the Agreement.  *Id.* ¶ 10(g) ("The Company may assign any of its rights under this Agreement to any successor entity to the Company, including, but not limited to, any entity formed by the Company to carry on the business of the Company.").

166.   Before at least December 10, 2015, the fact that Global had offered to acquire HPS, and the amount and timing of the offer to acquire HPS, constituted information that was not in the public domain.

167.   Before at least December 10, 2015, the fact that Global had offered to acquire HPS, and the amount and timing of the offer to acquire HPS, was information that was material to HPS.

168.   Before at least December 10, 2015, the fact that Global had offered to acquire HPS, and the amount and timing of the offer to acquire HPS, was "Confidential Information" under Carr's Agreement.

169.   Under the terms of Carr's Agreement, before at least December 10, 2015, Carr was required to maintain the confidentiality of Global's interest in and offer to acquire HPS.

170.   Under the terms of Carr's Agreement, before at least December 10, 2015, Carr was required to maintain the confidentiality of the fact that Global had offered to acquire HPS for $97.50 per share.

171.   Under the terms of Carr's Agreement and HPS' insider trading policy, before at least December 10, 2015, Carr was not permitted to use the information that Global expressed interest in acquiring, and had offered to acquire, HPS for his or Hanratty's (or anyone else's) personal benefit.

40

172.   Before at least December 10, 2015, Carr disclosed to Hanratty that Global was interested in acquiring HPS.

173.   Before at least December 10, 2015, Carr disclosed to Hanratty that Global had offered to acquire HPS for $97.50 per share.

174.   By disclosing to Hanratty before December 10, 2015 information about Global's offer to acquire HPS, and by using that information to his and Hanratty's personal benefit, Carr breached the Agreement.

175.   By disclosing to Hanratty and others information about HPS potentially being acquired, Global's offer price, and other non-public information relating to Global's acquisition of HPS, and by using that information to his and Hanratty's personal benefit, Carr breached the Agreement.

176.   Upon information and belief, Carr disclosed other HPS confidential information to Hanratty and other people.

177.   Carr's Agreement contains restrictive covenants, which survive his termination from HPS and which Carr re-affirmed during and after HPS' acquisition by Global.

178.   Although Carr's Agreement prohibited him from "directly or indirectly engag[ing] in any business or activity which . . . is developing products or services which compete with the products or services marketed, sold or being

developed by [HPS]" until **April 22, 2017** (*i.e.*, one year from the date he left HPS) (the "Non-Competition" provision), within a few weeks of leaving HPS, Carr began actively engaging in activities to form and develop Beyond, a new company that directly competes with HPS.  *See* Exs. N, O ¶ 5(a)

179.   Indeed, in an April 20, 2017, conference call hosted by Nomura Securities International, Inc., another former HPS employee and a co-founder of Beyond, Justin "Blaine" Burn, admitted that "as soon as Bob [Carr] left [Heartland], I left and **since the first of July last year Bob [Carr] and I had been building another company**."  The "company" that Carr and Burn were building is Beyond, which provides products and services that compete with HPS and which serves many of the same types of customers as HPS.

180.   Carr violated the Non-Competition provision of his Agreement by "directly or indirectly" engaging in activities aimed at "developing products or services which compete with the products or services marketed, sold or being developed by [HPS]" within twelve (12) months of leaving HPS.

181.   Such activities include, but are not limited to, (i) developing an electronic and corporate infrastructure to compete with HPS; (ii) developing products and services to compete with HPS, including products and services relating to electronic payment processing and payroll; (iii) developing business and

marketing strategies to compete with HPS, including strategies designed to induce

HPS customers to modify or terminate their contracts or business relationships

with HPS and provide their business to Beyond; (iv) creating a compensation plan

to induce HPS employees to terminate their contractual or employment

relationships with HPS and work for Beyond, including, but not limited to,

compensation plans relating to founder's stock and a commission plan that copies

HPS' "94" commission plan; (v) recruiting, inducing and enticing HPS employees

to terminate their employment with HPS and to work for Beyond (including, but

not limited to, through directly or indirectly funding, creating, developing or

managing the opportunityknocks.info website); (vi) hiring former HPS employees;

(vii) negotiating and agreeing with banks to serve as sponsor banks for Beyond's

payment processing services; and (viii) negotiating and agreeing with vendors to

provide products and services to Beyond to be used to compete against HPS.

182.   Further, while developing Beyond's products and services, Carr

requested, sought after, received, and/or used HPS' confidential information,

including confidential information regarding contract terms from Conan Lane.

183.   Carr also breached his non-solicitation covenants, which prohibited

him until April 22, 2018, from "directly or indirectly, induc[ing] other employees

of [HPS] to terminate their employment with [HPS] or engage in any Competing Business" (hereafter, the "Non-Solicitation" covenant).  *See* Ex. N ¶ 6(b).

184.   Carr has not acted alone in engaging in the unlawful acts described in this Complaint.  Instead, in a transparent attempt to try to avoid the restrictive covenants in his Agreement, Carr also used, prior to April 22, 2018, the employees, agents, and representatives of his new competing company, Beyond, to improperly solicit HPS' merchants and to induce HPS employees to leave HPS and join Beyond.  But Carr cannot avoid his restrictive covenants by using his new competing company as a straw man to engage in acts expressly prohibited by his Agreement.  Indeed, Carr's restrictive covenants make clear that he may not solicit HPS' customers and may not induce HPS' employees "directly **or indirectly**."  *See* Ex. N ¶¶ 5 and 6 (emphasis added).

185.   Carr's breaches of his Agreement, including his breaches of the confidentiality, Non-Competition, and Non-Solicitation covenants, have caused, and continue cause, HPS harm.

186.   In his Agreement, Carr acknowledged and agreed that HPS' confidential information and relationships were critical assets and that HPS would be damaged if any of the restrictive covenants were breached:

(a)    The Employee understands and acknowledges that because of the confidential and sensitive nature of the information to which the

Employee will have access during the course of his employment with the Company, **any unauthorized use, disclosure or misappropriation of such information will cause irreparable damage to the Company**.

(b)    **The Employee acknowledges that the Company has expended considerable resources to develop the confidential information and the relationships that the Company enjoys with its customers, suppliers, employees, officers and other agents, and these assets of the Company are critical to the business of the Company**. The Employee agrees that the restrictions set forth below are necessary to prevent even the inadvertent disclosure of this confidential information or the interference with these relationships and to protect the legitimate business interests of the Company and are reasonable in scope and content.

Ex. N ¶ 3 (emphasis added).

187.   The public interest is served by preventing Carr from further breaching his Agreement.  Indeed, while HPS will suffer additional harm if injunctive and other appropriate relief is not granted, Carr will suffer no prejudice if he is required to simply comply with restrictive covenants to which he has already agreed and for which he has already received substantial compensation.

188.   HPS has no adequate remedy at law.

189.   HPS is entitled to recover some or all of Carr's compensation, which he received as consideration for complying with his Agreement.  That is, given that Carr did not comply with his Agreement, he is not entitled to keep all of the compensation he received thereunder.

## JURY TRIAL

Global and HPS hereby demand a jury trial in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

1.      That the Court enter judgment in favor of HPS and against Carr on all Counts except Count Two;

2.      That the Court enter judgment in favor of HPS and against Hanratty on Count Two;

3.      That the Court order Carr and Hanratty to disgorge any and all profits they made in connection with Carr's breaches of his fiduciary duty and Hanratty's aiding and abetting of that breach; *i.e.*, from their insider trading transactions;

4.      That the Court order Carr to pay HPS all fees, costs and expenses they incurred in addressing, investigating and responding to all subpoenas, regulatory investigations, court proceedings and other actions relating to Carr's insider trading and related conduct;

5.      That the Court enter judgment in favor of HPS and against Carr on Count Three;

6.      That the Court enter an injunction requiring Carr, and those in concert with him, to abide by the terms of his Agreement, including the restrictive covenants;

7.      That the Court extend the Restrictive Period "by any amount of time that [Carr] has failed to comply with his promises contained in Section 5 of [the] Agreement," as set forth in Section 5(c) of the Agreement;

8.      That the Court award HPS any and all monetary relief to which it is entitled;

9.      That the Court award HPS its attorneys' fees and expenses;

10.     That the Court award HPS pre-judgment and post-judgment interest;

11.     That all costs be assessed against Carr and Hanratty; and

12.     That the Court award such other and further relief as shall it considers just and proper.

DATED:  May 29, 2018                    **NUKK-FREEMAN & CERRA, P.C**.

                                        By:s/*Kirsten McCaw Grossman*
                                        Kerrie R. Heslin
                                        Kirsten McCaw Grossman
                                        Ryan S. Carlson
                                        Telephone: (973) 665-9100
                                        Fax: (973) 665-9101
                                        kheslin@nfclegal.com
                                        kgrossman@nfclegal.com
                                        rcarlson@nfclegal.com

(*Pro hac vice forthcoming*):
**BONDURANT, MIXSON & ELMORE
     LLP**

Steven J. Rosenwasser
Patrick C. Fagan
Fredric J. Bold, Jr.
3900 One Atlantic Center
1201 West Peachtree Street NW
Telephone:  (404) 881-4100
Fax:  (404) 881-4111
rosenwasser@bmelaw.com
fagan@bmelaw.com
bold@bmelaw.com
*Attorneys for Plaintiff*
 *Heartland Payment Systems, LLC*

## **CERTIFICATION**

I certify that I have no knowledge of any other action or arbitration involving the matter in controversy, nor have I any knowledge at this time of any additional parties who should be joined in this action.

NUKK-FREEMAN & CERRA, P.C.
*Attorneys for Plaintiff*

_____
Kirsten McCaw Grossman

Dated:  May 29, 2018

49