Kerrie R. Heslin, Esq.
Kirsten Grossman, Esq.
Ryan S. Carlson, Esq.
NUKK-FREEMAN & CERRA, P.C.
26 Main Street, Suite 202
Chatham, New Jersey 07928
Tel.: (973) 665-9100
Fax: (973) 665-9101
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HEARTLAND PAYMENT SYSTEMS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT O. CARR and KATHIE HANRATTY, <br><br> Defendants. | Civil Action No.: <br><br> 3:18-cv-09764-BRM-DEA <br><br> Jury Trial Demanded |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff Heartland Payment Systems, LLC ("HPS") whose principal place of business is 3550 Lenox Road, Suite 3000, Atlanta, Georgia 30326, brings this action against Defendants Robert O. Carr ("Carr"), who upon information and belief resides at 82 Library Place, Princeton, New Jersey 08540, and Kathie Hanratty ("Hanratty"), who upon information and belief resides at 319 Thomaston Road, Unit 102, Watertown, Connecticut 06795.[1]

## I.   INTRODUCTION AND NATURE OF THE ACTION

1.     Until April 22, 2016, Carr was the CEO of HPS and Chairman of HPS' Board of Directors.  In those roles, Carr owed HPS a fiduciary duty, as well as other common law duties of loyalty and honesty.  In addition, Carr was subject to the terms and provisions of his employment contract, as amended from time to time.

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(1), HPS is filing this First Amended Complaint as a matter of course because it is within 21 days of Carr serving a responsive pleading or a motion under Rule 12(b), (e) or (f).  *See Villery v. Dist. of Columbia*, 277 F.R.D. 218, 219 (D.D.C. 2011) ("If there is more than one defendant, and not all have served responsive pleadings, the plaintiff may amend the complaint as a matter of course with regard to those defendants that have yet to answer."); *Culver v. Lithia Motors, Inc.*, 2016 WL 7426587, at *7 (D.N.M.  May 12, 2016) ("where there are multiple defendants, and this twenty-one day period has expired as to some defendants but not others, the plaintiff may amend the complaint as a matter of course as to those defendants for whom the twenty-one day period has not yet expired.") (*quoting Hylton v. Anytime Towing,* 2012 WL 1019829 (S.D. Cal. Mar. 26, 2012)); *American Realty Investors, Inc. v. Prime Income Asset Mgmt.*, 2013 WL 5663069, at *5 (D. Nev. Oct. 15, 2013) ("In cases involving multiple defendants, the 21-day deadline operates only as to those defendants that have filed a responsive pleading or eligible motion under Rule 12.").  This amendment does not include any amendments of HPS' claims against Hanratty.

2.      Carr breached his duty to HPS when he (i) improperly disclosed material, non-public information regarding Global Payment Inc.'s ("Global") potential acquisition of and offer to acquire HPS to his girlfriend, Kathie Hanratty; (ii) improperly engaged in insider trading by sending Hanratty funds to purchase HPS stock in advance of the public announcement that Global was acquiring HPS for a premium over HPS' then-share price and (iii) misrepresented to HPS and FINRA that he did not disclose any material, non-public information to Hanratty in an effort to conceal his unlawful insider trading.

3.      Through this action, HPS seeks to disgorge the illicit profits that Carr and Hanratty obtained through their insider trading scheme; to recover the monetary damages it suffered as a result of Carr's and Hanratty's unlawful conduct; and to obtain monetary and injunctive relief to remedy Carr's other breaches, including Carr's breaches of his non-competition and non-solicitation covenants.

## II.      STATEMENT OF THE RELEVANT FACTS

### Carr's Insider Trading and
### Improper Disclosures of Material, Non-Public and Confidential Information

4.      In the fall of 2015, Global and HPS began communicating about the possibility of Global acquiring HPS.  Global's communications with HPS were through Carr.

5.      Before December 10, 2015 (the day rumors first circulated in news reports regarding Global's potential acquisition of HPS) and before December 15, 2015 (the day that Global and HPS publicly announced the acquisition), Global's interest in acquiring, and offer to acquire, HPS constituted material, non-public, and confidential information.

6.      Accordingly, Carr had a duty to maintain Global's interest in and offer to acquire HPS strictly confidential until at least December 10, 2015.

7.      In breach of his fiduciary and other duties, Carr, before December 10, 2015, improperly disclosed Global's interest in and offer to acquire HPS to Hanratty, and improperly used that confidential information to personally benefit himself and Hanratty.

8.      Specifically, after improperly disclosing to Hanratty Global's interest in and offer to acquire HPS (including the specific offer amount), Carr caused Hanratty to purchase or, at a minimum, provided Hanratty with instructions and funds to purchase, HPS stock before December 10, 2015.  In an apparent attempt to try and hide their insider trading, Carr sent Hanratty funds to purchase the HPS stock in her own (and not Carr's) name.

9.      Through their unlawful insider trading, Carr and Hanratty obtained illicit profits from the increase in HPS' stock after the acquisition was publicly announced.  Specifically, at Carr's instruction, Hanratty purchased HPS' stock for roughly $79 per share (before the acquisition was announced publicly) and sold it

only a few months later (after the acquisition was announced) for roughly $101 per share: a more than 25% gain.

10.     More specifically, Global and HPS executives agreed to meet on November 9, 2015 to discuss the contemplated acquisition.

11.     Although Global's meeting with HPS was confidential, at some point before November 9, 2015, Carr, in furtherance of his and Hanratty's insider trading scheme, improperly informed Hanratty of the meeting and Global's interest in acquiring Heartland.

12.     Indeed, at 7:15 a.m. on November 9, 2015, Hanratty emailed Carr to "[h]ave a good meeting with Global".  Exhibit A.  *See also* Exhibit B (Nov. 9, 2015 email from Hanratty to Carr asking "[h]ow was your meeting at Global?").

13.     Later that day, Carr sent Hanratty an email unequivocally disclosing to her the material, non-public and confidential information that Global had just offered $97.50 per share for HPS.  An image of that email is below and a true and correct copy of the email is attached at Exhibit B:

On Nov 9, 2015, at 6:47 PM, Carr, Robert O. <bob.carr@e-hps.com> wrote:

> Just landed back in Philadelphia.  Sweet girls, those lanes.   Meeting was good.  Price is $97.50 and closing would be late December.

14.     Hanratty replied: "Wow quite an offer."  *Id.*

15.     At the time of this email exchange (*i.e.*, on November 9, 2015), neither the fact that Global had offered to acquire HPS nor the price that Global

offered for the acquisition were public information.  Rather, the information was material, non-public, and confidential.

16.     Carr, aided and abetted by Hanratty, used the material, non-public and confidential information to engage in unlawful insider trading.

17.     At some point between November 9 and November 16, 2015, Carr sent Hanratty an out-of-state check for her to deposit in a bank account in her name and to then use the funds to purchase HPS stock before Global's acquisition of HPS was publicly announced.

18.     That scheme is shown, in part, by emails Carr and Hanratty exchanged on November 16 and 17, 2015.

19.     On November 16, 2015, Hanratty emailed Carr that she had "[m]ade arrangements with [her] bank to deposit the check and buy stock through their on line partner as soon as it clears in about 2 days."  An image of that email is copied below and a true and correct copy of the email is attached as Exhibit C.

-----Original Message-----
From: Kathie Hanratty [mailto:khanratty@jacicarroll.com]
Sent: Monday, November 16, 2015 12:35 PM
To: Carr, Robert O.
Subject:

Made deposit.
Going to get bacon for Ben for dinner preparations and then some walking in this glorious day Ps. Made arrangements with my bank to deposit the check and buy stock through their on line partner as soon as it clears in about 2 days.
Sent from my iPhone

20.     Carr responded to that email: "It is a really great day today!"  *Id.*

21.    The next day, Hanratty emailed Carr to inform him that
"**Arrangements are made to purchase the HPY stock as soon as the out
of state check clears, <u>I am following your advice to the letter . . . .</u>**"[2] An
image of that email is below and a true and correct copy of the email is
attached at Exhibit D.

-----Original Message-----
From: Kathie Hanratty [mailto:khanratty@jacicarroll.com]
Sent: Tuesday, November 17, 2015 5:01 PM
To: Carr, Robert O.
Subject: RE:

Safe journey to Plano
I went to the bank today and privately made the deposit (big gulp OMG) with the branch manager in
her office.   Arrangements are made to purchase the HPY stock  as soon as the out of state check clears.
I am following your advice to the letter and keeping the amount you suggested in a saving account for
now.  I have never felt so free from stress and worry  (that stuff you don't believe in LOL) in my entire
life.  Saying thank you is not enough but I am not sure what else to say.

22.    Carr responded to that email: "It's all good!"  *Id.*

23.    As of November 17, 2015, when the above email exchange occurred,
neither the fact that Global was offering to acquire HPS nor the amount of Global's
offer was public information.  Rather, it was material, non-public, and confidential
information that Carr was prohibited from using for his or anyone else's personal
benefit.

24.    The next day, Hanratty opened a new bank account, and named Carr
as the beneficiary of that account.

---

[2] HPY was the ticker symbol for HPS.

25.    Indeed, in a November 18, 2015 email Hanratty told Carr: "**I am at the bank opening my account and I am making you the beneficiary . . . .**"  A true and correct copy of this email exchange is attached hereto as Exhibit E.

26.    Later that same day, Hanratty informed Carr by email that she had purchased HPS' stock: "I am a shareholder."  A true and correct copy of this email exchange is attached hereto as Exhibit F.

27.    Carr responded: "Our stock closed at $79.27 today – thanks for buying :)! roc."[3]  *Id.*

28.    On November 18, 2015, Hanratty replied to Carr:

> **The investment person from Webster called me as the broker bought 8500 shares and will get the remainder tomorrow.**

*Id.* (emphasis added).

29.    On November 23, 2015, roughly two weeks after Carr improperly disclosed to Hanratty Global's offer to acquire HPS for $97.50 per share, and roughly one week after Carr sent Hanratty money to purchase HPS' stock based on material, non-public, and confidential information, Hanratty sent Carr an email stating, in part: "**I will treat your gift with respect and not squander a penny but rather <u>I have done exactly what you recommended I do with it and made you the beneficiary of the account</u>.**"  A true and correct copy of this email is attached as Exhibit G.

---

[3] "roc" are Carr's initials.

30.     The next day, November 24, 2015, Carr again disclosed to Hanratty HPS' non-public, material, and confidential information.  Specifically, Carr emailed Hanratty: "Sounds good.  **__Just got the offer - $97.50.__**"  An image of that email is copied below and a true and correct copy of the email is attached as Exhibit H.

On Nov 24, 2015, at 5:01 PM, Carr, Robert O. <bob.carr@e-hps.com> wrote:

    Sounds good.  Just got the offer - $97.50.  xoxo

31.     Hanratty responded to Carr's email: "Wonderful.  Remember Emmalee said $100 or nothing.  Lol".  *Id.*

32.     The email exchange referenced in Paragraphs 30 and 31 above demonstrates that Carr continued to knowingly breach his duty to HPS, continued to improperly disclose HPS' material, non-public, and confidential information, and continued to use that information for his and Hanratty's personal benefit.

33.     On December 10, 2015, rumors of a potential Global acquisition of HPS first appeared in news reports.  On December 15, 2015, Global and HPS first publicly disclosed the Global/HPS transaction.[4]

34.     In short, after improperly disclosing to Hanratty that Global had initially offered $97.50 per share to acquire HPS on November 9, 2015, Carr sent Hanratty (at least) nearly one million dollars to purchase HPS stock at roughly $79

---

[4] *See* https://www.businesswire.com/news/home/20151215006816/en/Global-Payments-Acquire-Heartland-Payment-Systems-4.3

per share, all before the public announcement of Global's offer; *i.e.*, Carr and Hanratty purchased HPS stock using material, non-public and confidential information.

35.     Carr's and Hanratty's unlawful scheme did not end there.  In early April 2016, Carr and Hanratty communicated regarding selling HPS' stock to monetize and maximize their illicit profits and to conceal their insider trading.  *See* Exs. I - L.

36.     On April 11, 2016, Hanratty emailed Carr that she is "meet[ing] with the person at Webster Bank Investments tomorrow.  Should I put in my sell order now or wait until next week?  Second question, how do I get the money to you or Peter to invest as we discussed this weekend.  I am not certain how to facilitate this."  A true and correct copy of that email is attached hereto as Exhibit I.

37.     At 6:50 a.m. the next day, April 12, 2016, Hanratty emailed Carr that she has "that meeting at the bank at 9am to sell my HPY stock . . . ."  A true and correct copy of that email is attached hereto as Exhibit J.

38.     At 9:13 a.m. that same day, Carr responded to Hanratty: "I am meeting with Peter today so let's discuss after that.  I can call you before I get on my flight tonight.  How much HPY stock would you be selling?"  A true and correct copy of that email is attached hereto as Exhibit K.

39.     Hanratty replied: "I have $1,156,814.00 in my account today at this very moment in stock and cash/dividends = 11,393 shares of HPY.  She has 2

proposals to review with me this morning that I haven't seen but my thought was to sell all of it and give to Peter to manage." *Id.*

40.     Carr responded: "Have to say that I agree with you!" *Id*.

41.     Later that same day, Hanratty emailed Carr again regarding the sale of HPS' stock writing: "Is there any reason I shouldn't sell today at [$]101.37 which is more than the [$]100 sale price". Carr responded: "No reason at all". An image of this email exchange is copied below and a true and correct copy of the email is attached as Exhibit L.

---

**From:** Carr, Robert O. [mailto:bob.carr@e-hps.com]
**Sent:** Tuesday, April 12, 2016 9:47 AM
**To:** Kathie Hanratty
**Subject:** Re: Call 212-288-1538 - to Set appointment with Dr Seinfeld - Bob and Dr. Seinfeld

No reason at all

Sent from my iPhone

On Apr 12, 2016, at 9:39 AM, Kathie Hanratty <khanratty@jacicarroll.com> wrote:

Is there any reason I shouldn't sell today at 101.37 which is more than the 100 sale price

Sent from my iPhone

---

42.     The $101.37 sales price is more than 25% higher than the roughly $79 per share Carr and Hanratty paid just a few months earlier.

## Carr's Misrepresentations to HPS and FINRA

43.     Carr knew that he had an obligation to neither disclose Global's offer to acquire HPS to Hanratty nor, having improperly disclosed material, non-public

information, send Hanratty funds to purchase HPS stock or otherwise participate in or facilitate Hanratty's purchase of HPS stock.

44.     That knowledge is evidenced, in part, by Carr's efforts to conceal and hide his conduct from HPS and FINRA.

45.     In December 2015, and again in March 2016, FINRA contacted HPS to investigate trading in HPS stock during the weeks leading up to the December 15, 2015 public announcement of Global's acquisition of HPS.

46.     FINRA's initial December 2015 investigation required that HPS identify all individuals who had knowledge of the Global/HPS transaction before it was publicly announced on December 15, 2015.

47.     In response to FINRA's inquiry, Carr did not identify Hanratty as an individual who had prior knowledge of the Global/HPS transaction.

48.     Although Carr knew that he had disclosed non-public information regarding the Global/HPS transaction to Hanratty before December 15, 2015, Carr failed to identify Hanratty even though (and likely because) he knew that HPS was seeking the information in order to respond to a FINRA investigation.

49.     Carr knowingly misrepresented the truth to HPS and FINRA when he failed to identify Hanratty as a person who had non-public knowledge of Global's offer to acquire HPS before December 15, 2015.

50.     Carr's failure to identify Hanratty violated Carr's duties to HPS.

51.    In or about late March 2016, FINRA made a second inquiry with HPS regarding suspicious trades leading up to the public announcement of Global's acquisition of HPS.

52.    This time, FINRA provided HPS with the names of specific individuals of interest, including Hanratty, and asked HPS to (i) identify all individuals within HPS who knew the listed individuals; (ii) provide detailed information about the nature, history, and frequency of contact of those relationships; and (iii) identify the circumstances through which any of the listed persons may have gained non-public knowledge regarding Global's acquisition of HPS.

53.    HPS asked Carr to provide the company with the information requested in Paragraph 52 above so HPS could fully and truthfully respond to FINRA.

54.    In particular, and among other things, HPS asked Carr to provide information about his relationship with Hanratty and any instances in which he communicated with her regarding Global's acquisition of HPS before December 15, 2015.

55.    In response to the HPS' inquiry, Carr failed to provide truthful and complete information to HPS about his disclosures to Hanratty.

56.    Instead of fully and truthfully disclosing to HPS (and FINRA) his unlawful insider trading and improper disclosures of material, non-public, and

confidential information to Hanratty, Carr falsely represented that he had not disclosed to Hanratty non-public information about Global's acquisition before December 15, 2015.

57.     Relying on Carr's representations, and unaware that Carr was concealing the truth, on April 21, 2016, HPS informed FINRA that Carr "did not discuss the HPY/GPN transaction with Ms. Hanratty prior to the December 15th Announcement" and he did "not know if Ms. Hanratty had knowledge or awareness of the discussions between HPY and GPN, and, if so, how such knowledge or awareness was obtained."

58.     Carr's misrepresentations to HPS and FINRA about his disclosures to Hanratty were not an oversight or trivial omission.  Rather, they were intentional and designed to conceal the truth of his unlawful conduct from HPS and FINRA.

59.     Upon information and belief, Carr and Hanratty discussed their conspiracy and plan to cover-up their insider trading during a call they had had on or about April 20, 2016, as evidenced by the email exchange copied below:

**From:** Carr, Robert O. [mailto:bob.carr@e-hps.com]
**Sent:** Wednesday, April 20, 2016 5:01 PM
**To:** Kathie Hanratty
**Subject:** RE: VW to pay US customers $5,000 each to settle emissions scandal

Financial Industry Regulatory Authority – they are investigating about 100 people who purchased shares before the announcement of the Global-HPY merger.

**From:** Kathie Hanratty [mailto:khanratty@jacicarroll.com]
**Sent:** Wednesday, April 20, 2016 3:55 PM
**To:** Carr, Robert O.
**Subject:** RE: VW to pay US customers $5,000 each to settle emissions scandal

Okay.  I will be home by then.
What is Finra?

**From:** Carr, Robert O. [mailto:bob.carr@e-hps.com]
**Sent:** Wednesday, April 20, 2016 3:53 PM
**To:** Kathie Hanratty
**Subject:** RE: VW to pay US customers $5,000 each to settle emissions scandal

Thx.  We need to chat tonight – about FINRA.  FINRA is researching stock purchases prior to Dec 15th.  When is a good time to call you – it needs to be after 8pm.

A true and correct copy of this email is attached hereto as Exhibit M.

60.     Carr sent the April 20 email referenced above the day before HPS

submitted its second "Review of Trading" report to FINRA.

61.     Carr's misrepresentations to HPS and FINRA constituted a breach of

Carr's duties to HPS, including, but not limited to, a breach of his fiduciary duty

and common law duties of loyalty, trust and honesty.

## III.   PARTIES, JURISDICTION AND VENUE

62.     HPS is a limited liability company organized and existing under the laws of the State of Delaware.[5]  HPS' principal place of business is currently located at 3550 Lenox Road, Suite 3000, Atlanta, Georgia 30326.

63.     HPS' sole member is Global.  Global is a Georgia corporation with its principal place of business located at 3550 Lenox Road, Suite 3000, Atlanta, Georgia 30326.

64.     Before being acquired by Global, HPS was a publicly-traded company.  HPS traded under the ticker symbol HPY on the New York Stock Exchange.

65.     Both before and after being acquired by Global, HPS operated as a nationwide provider of electronic payment processing services; *i.e.*, HPS provides merchants with products and services that assist merchants in accepting debit, credit, and similar cards as forms of payment.  Among other things, HPS facilitates electronic payment transactions by transmitting debit and credit card information from merchants to credit card networks, such as the VISA network.  HPS also assists banks and merchants in transferring funds relating to purchases and refunds

---

[5] The company Carr founded was Heartland Payment Systems, Inc.  That entity was merged into Plaintiff Heartland Payment Systems, LLC as part of the merger with Global.  Heartland Payment Systems, Inc. no longer exists as a separate corporate entity.  Throughout this Complaint, HPS refers to Heartland Payment Systems, Inc. before the merger and Heartland Payment Systems, LLC after the merger.

and leases and sells products relating to electronic processing, such as point-of-sale terminals.

66.    In April 2016, Heartland Payment Systems, Inc. merged with HPS. By and through that merger, HPS has obtained all of Heartland Payment Systems, Inc.'s rights and claims, including, but not limited to, the rights and claims under Carr's Agreement[6] and the right to assert claims against Carr for any breaches of his fiduciary duty. *See* Ex. N Section 10(g) ("The Company may assign any of its rights under this Agreement to any successor entity to the Company, including, but not limited to, any entity formed by the Company to carry on the business of the Company.").

67.    Defendant Carr is an individual who, upon information and belief, resides at 82 Library Place, Princeton, New Jersey 08540.  Upon information and belief, Carr has resided in Princeton, New Jersey from at least November 2015 to the present.

68.    When Carr breached his fiduciary duty to HPS, breached his duties of loyalty, trust and good faith, and breached his contractual obligations to HPS, Carr resided in New Jersey.

---

[6] Throughout this Complaint, "Agreement" refers to Carr's May 4, 2007 Amended and Restated Employee Confidential Information and Noncompetition Agreement, as amended. *See infra* ¶¶ 227-28.

69.     Additionally, during relevant time periods when Carr breached his duties to HPS, HPS conducted business in New Jersey and had its principal place of business at 90 Nassau Street, Princeton, New Jersey 08542.

70.     Carr improperly disclosed and used material, non-public information relating to Global's acquisition of HPS while he was in New Jersey.

71.     Carr improperly disclosed and used material, non-public, and confidential information relating to Global's acquisition of HPS using a New Jersey telephone number and/or in emails he sent from New Jersey.

72.     Carr exchanged emails and telephone calls with Hanratty in furtherance of his breaches of fiduciary duty and other duties while he was in New Jersey.

73.     In his Agreement, Carr expressly consented to jurisdiction and venue in this Court.  Specifically, Section 10(d) of Carr's Agreement states:

> Any suit, action or proceeding arising out of or relating to this Agreement shall be brought only in the Superior Court in the County of Mercer, New Jersey or the United States District Court for the District of New Jersey, and Employee hereby agrees and consents to the personal and exclusive jurisdiction of said courts over him or her as to all suits, actions and proceedings arising out of or related to this Agreement, and Employee further waives any claim that such suit, action or proceeding is brought in an improper or inconvenient forum.

*See* Ex. N at Section 10(d).

74.     Defendant Hanratty is an individual who, upon information and belief, resides at 319 Thomaston Road, Unit 102, Watertown, Connecticut 06795-2054.

18

75.     Hanratty communicated and conspired with Carr, and aided and abetted Carr's breaches of fiduciary duty, while Carr was in New Jersey.

76.     In particular, while Carr was in New Jersey, Hanratty communicated and conspired with Carr via telephone and/or email regarding Global's offer to acquire HPS, purchasing HPS stock, the status of Global's acquisition of HPS, selling HPS stock, and FINRA's investigation into Carr's and Hanratty's purchase of HPS stock.

77.     In addition, Hanratty was physically present (and with Carr) in New Jersey on numerous occasions between November 1, 2015 and December 15, 2015.  Upon information and belief, while Hanratty was in New Jersey with Carr they discussed Global's offer to acquire HPS, purchasing HPS stock and/or the status of Global's acquisition of HPS.  Upon information and belief, Hanratty was also physically present (and with Carr) in New Jersey when they discussed concealing their insider trading from HPS and FINRA.

78.     Carr's breaches of his fiduciary duty, and Hanratty's aiding and abetting Carr's breaches of fiduciary duty, were directed toward HPS, a company that, at the time, maintained its principal place of business in New Jersey.

79.     Carr's breaches of his fiduciary duty, and Hanratty's aiding and abetting Carr's breaches of fiduciary duty, injured HPS in at least New Jersey and Delaware.

80.     Upon information and belief, Carr sent or caused to be sent from New Jersey the funds that he provided to Hanratty to purchase HPS stock.  Similarly, the funds that Hanratty received from Carr to purchase HPS stock were sent or caused to be sent from New Jersey.

81.     Hanratty was aware that Carr was taking action in furtherance of their unlawful conspiracy to engage in insider trading while he was present in New Jersey.

82.     Carr's conduct and actions in New Jersey, as they relate to the insider trading allegations alleged herein, can also be attributable to Hanratty.

83.     This Court possesses subject matter jurisdiction over this dispute under Carr's Agreement and 28 U.S.C. § 1332(a).

84.     Complete diversity exists because Carr is a citizen of New Jersey, Hanratty is a citizen of Connecticut, and HPS is a citizen of Delaware; *i.e.*, neither Defendant currently resides in the same state as Plaintiff.

85.     Through this Complaint, HPS seeks, among other things, (i) disgorgement of the illicit profits Carr and Hanratty obtained through their unlawful insider trading; (ii) return of Carr's 2015 and 2016 compensation; (iii) monetary damages; and (iv) an injunction requiring Carr to comply with the terms of his contracts with HPS moving forward.

86.     Accordingly, the amount-in-controversy requirement exceeds $75,000, exclusive of interest and costs.

87.     With respect to Carr's breaches of fiduciary duty and Hanratty's aiding and abetting Carr's breaches of fiduciary duty, Delaware law applies under, among other things, the internal affairs doctrine.

88.     With respect to Carr's breaches of his Agreement, New Jersey law applies.  *See* Ex. N at Section 10(b).

## COUNT ONE – BREACH OF FIDUCIARY DUTY (AGAINST DEFENDANT CARR) (DELAWARE LAW)

89.     HPS repeats and re-alleges Paragraphs 1 through 88 above as if fully stated herein.

90.     From October 2000 until April 22, 2016, Carr served as HPS' CEO and as Chairman of HPS' Board of Directors.

91.     As HPS' Chairman and CEO, Carr owed HPS a fiduciary duty.

92.     Carr and HPS maintained a relationship of trust and confidence.

93.     As HPS' Chairman and CEO, Carr was required to maintain the confidentiality of HPS' confidential information.

94.     As HPS' Chairman and CEO, Carr had a fiduciary duty not to buy or sell HPS' stock, or tip another person to buy or sell HPS' stock, based on material, non-public information.

95.     Carr had a fiduciary duty not to use HPS' material, non-public, and confidential information to personally benefit himself, Hanratty, or others.

96.     Carr also had a duty to comply with HPS' insider trading policy, which prohibited Carr from "trading in securities . . . based on knowledge that comes from [his] job[], when that information is not known to the public" and from "giv[ing] tips to others which allow them to trade securities and property using such 'insider information'."

97.     As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr improperly disclosed HPS' material, non-public, and confidential information to Hanratty and improperly used that information for his and Hanratty's personal benefit.   In particular, Carr improperly disclosed to Hanratty and improperly used for his and Hanratty's personal benefit the following material information before it was publicly available and at a time when Carr had a fiduciary duty to maintain its confidence:

a.     Global's interest in acquiring HPS;

b.     Global's initial offer to acquire HPS for $97.50/share;

c.     The initial targeted closing date for the acquisition; and

d.     Global's subsequent offer to acquire HPS for $97.50/share.

*See* Exs. A-L.

98.     By improperly disclosing and using HPS' material, non-public, and confidential information to Hanratty and others, Carr breached his fiduciary duty to HPS.

99.     After improperly disclosing material, non-public information about Global's interest in and offer to acquire HPS, Carr, aided and abetted by Hanratty, engaged in unlawful insider trading.

100.    As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr and Hanratty schemed and conspired to breach Carr's fiduciary duty to HPS and to engage in insider trading by:

a.      Carr tipping and otherwise providing Hanratty with material, non-public and confidential information about HPS (*i.e.*, details about the timing and amount of Global's offer to acquire HPS) to be used in making securities transactions;

b.      Carr sending Hanratty an out-of-state check for the purpose of using the funds to purchase HPS stock before Global's acquisition of HPS stock was publicly announced; and

c.      Hanratty, with Carr's participation, funding and facilitation, using HPS' material, non-public and confidential information in purchasing HPS stock before the public announcement of Global's acquisition of HPS.

*See* Exs. A-L.

101.    Each of the actions described in Paragraph 100 above constituted a breach of Carr's fiduciary duty to HPS.

102.    After his November 9, 2015 meeting with Global during which Global informed Carr of the $97.50 offer to acquire HPS, but before December 10, 2015, when rumors of Global's potential acquisition of HPS first appeared in news reports, Carr sent Hanratty a check with the intention that some or all of the funds would be used to purchase HPS stock.  At a minimum, Carr knew that Hanratty

was using the funds to purchase HPS stock with knowledge of material, non-public and confidential information he had provided her.

103.    After his November 9, 2015 meeting with Global during which Global informed Carr of the $97.50 offer to acquire HPS, but before the December 10, 2015 rumors in news reports and the December 15, 2015 public announcement of Global's agreement to acquire HPS, Carr advised and instructed Hanratty regarding how to set up a brokerage account for the purpose of purchasing HPS stock.

104.    Hanratty purchased HPS stock on or about November 18, 2015.

105.    The HPS stock that Hanratty purchased on or about November 18, 2015, was purchased, in whole or in part, with funds that she received from Carr in November 2015.

106.    Hanratty's purchase of HPS stock in or around November 18, 2015, personally benefitted herself and/or Carr.

107.    Carr used HPS' material, non-public information to make or cause to be made securities transactions that were motivated, in whole or in part, by the substance of that information.

108.    Carr retained a beneficial interest in the proceeds of the unlawful insider trading given that Hanratty named him as the beneficiary of her brokerage/ investment account.  Carr also received non-monetary benefits from Hanratty as a result of their insider trading.

109.   In April 2016, Carr and Hanratty communicated regarding timing the sale of the HPS stock that Hanratty purchased (using Carr's funds) on or about November 18, 2015.

110.   On April 11-12, 2016, Carr communicated with Hanratty regarding whether she should sell the HPS stock she purchased (using Carr's funds) on or about November 18, 2015.

111.   On or around April 12, 2016, Hanratty sold the HPS stock that she purchased in November 2015 (using Carr's funds) for more than $101 per share.

112.   On or about April 20, 2016, Carr and Hanratty communicated about the fact that FINRA was investigating certain purchases of HPS stock in November 2015.

113.   On or about April 20, 2016, Carr and Hanratty communicated about the fact that the purchases of HPS stock in Hanratty's name in November 2015 were among the purchases about which FINRA was inquiring.

114.   Upon information and belief, on or around April 20, 2016, Carr and Hanratty communicated regarding representing to FINRA that they never discussed any non-public information about Global's acquisition of HPS.

115.   Carr represented to HPS that he never provided any non-public information about Global's acquisition of HPS to Hanratty.

116.   Carr's representation to HPS in Paragraph 115 was false.

117.   Carr misrepresented the truth, including through omission of material facts, during his responses to HPS in the course of HPS' preparation of its two response letters to FINRA.

118.   By using HPS' material, non-public, and confidential information to benefit himself and Hanratty, Carr breached his fiduciary duty to HPS.

119.   By providing false information to HPS in connection with FINRA's investigation into trading of HPS stock in the weeks leading up to the public announcement of Global's acquisition of HPS, Carr breached his fiduciary duty to HPS.

120.   Carr's breaches of his fiduciary duty to HPS caused HPS harm.

121.   Alternatively, even if HPS had not been harmed, HPS is permitted to bring a *Brophy* action against Carr for breaching his fiduciary duty by engaging in insider trading.  *See, e.g.*, *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949); *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

122.   HPS is entitled to disgorgement of any illicit profits that Carr and Hanratty obtained in connection with or through their improper and unlawful insider trading scheme.

123.   HPS is also entitled to recover from Carr all of the fees, costs and expenses it incurred as a result of Carr's unlawful conduct.

## <u>COUNT TWO – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (AGAINST DEFENDANT HANRATTY) (DELAWARE LAW)</u>

124.   HPS repeats and re-alleges Paragraphs 1 through 123 above as if fully stated herein.

125.   As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr improperly disclosed HPS' material, non-public, and confidential information to Hanratty and improperly used that information for his and Hanratty's personal benefit.   In particular, Carr improperly disclosed to Hanratty and improperly used for his and Hanratty's personal benefit the following material information before it was publicly available and at a time when Carr had a fiduciary duty to maintain its confidence:

      a.    Global's interest in acquiring HPS;

      b.    Global's initial offer to acquire HPS for $97.50/share;

      c.    The initial targeted signing date for the acquisition; and

      d.    Global's subsequent offer to acquire HPS for $97.50/share.

*See* Exs. A-L.

126.   After improperly disclosing material, non-public, and confidential information regarding Global's interest in and offer for HPS, Carr, knowingly aided and abetted by Hanratty, engaged in unlawful insider trading based on that information.

127.   The purpose of the conspiracy and scheme was to personally benefit Carr and Hanratty.

128.   As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr, knowingly aided and abetted by Hanratty, breached his fiduciary duty to HPS and engaged in insider trading by:

    a.    Carr tipping and otherwise providing Hanratty with material, non-public and confidential information about HPS (*i.e.*, details about the timing and amount of Global's offer to acquire HPS) to be used in making securities transactions;

    b.    Carr sending Hanratty an out-of-state check for the purpose of using the funds to purchase HPS stock before Global's acquisition of HPS stock was publicly announced; and

    c.    Hanratty, with Carr's participation, funding and facilitation, using HPS' material, non-public and confidential information in purchasing HPS stock before the public announcement of Global's acquisition of HPS.

129.   Each of the actions described in Paragraph 128 above constituted a breach of Carr's fiduciary duty to HPS, which Hanratty knowingly aided and abetted.

130.   By using HPS' material, non-public, and confidential information to benefit himself and Hanratty, Carr breached his fiduciary duty to HPS, which Hanratty knowingly aided and abetted.

131.   Hanratty knowingly aided and abetted Carr in breaching his fiduciary duty to HPS by, among other things:

a.   Receiving funds from Carr with the intent and purpose of using such funds to purchase HPS securities using material, non-public and confidential information;

b.   Opening a bank account to hold some or all of the funds or HPS securities, with Carr being named as a beneficiary to that account; and

c.   Purchasing HPS stock at Carr's direction and relying upon Carr's disclosure of HPS' material, non-public and confidential information in making the purchase.

132.   After learning of Carr's November 9, 2015 meeting with Global and Global's $97.50/share offer, but before the December 10, 2015 rumors in news reports and the December 15, 2015 public announcement of Global's offer to acquire HPS, Hanratty accepted a check from Carr with the intention that some or all of the funds would be used to purchase HPS stock.

133.   After learning of Global's November 9, 2015 meeting with Global and Global's $97.50/share offer, but before the December 10, 2015 rumors in news reports and the December 15, 2015 public announcement of Global's offer to acquire HPS, Hanratty, with and relying upon Carr's instruction and advice, set up a brokerage account for the purpose of purchasing HPS stock.

134.   Hanratty, in concert with Carr, purchased HPS stock on or about November 18, 2015.

135.   The HPS stock that Hanratty purchased on or about November 18, 2015, was purchased, in whole or in part, with funds that she received from Carr in November 2015.

136.   Carr retained a beneficial interest in the proceeds of the unlawful insider trading given that Hanratty named him as the beneficiary of her brokerage/ investment account.  Hanartty also provided Carr with non-monetary benefits as a result of and in exchange for their insider trading.

137.   In April 2016, Carr and Hanratty communicated regarding timing the sale of the HPS stock that Hanratty purchased (using Carr's funds) on or about November 18, 2015.

138.   In April 2016, Hanratty, working in concert with Carr, sold the HPS stock she purchased (using Carr's funds) on or about November 18, 2015.

139.   On or about April, 20, 2016, Carr and Hanratty communicated about the fact that FINRA was investigating HPS stock purchases in November 2015.

140.   On or about April, 20, 2016, Carr and Hanratty communicated about the fact that Hanratty's purchase of HPS stock (using Carr's funds) in November 2015 was among the purchases that FINRA had inquired about.

141.   Upon information and belief, on or about April 20, 2016, Carr and Hanratty communicated regarding falsely representing to FINRA that they never discussed any non-public information regarding Global's acquisition of HPS.

142.   Through the actions cited above and others, Hanratty played a substantive and material role in aiding and abetting Carr's breaches of his fiduciary duty.

143.   Hanratty aided and abetted Carr in using HPS' material, non-public, and confidential information to make or cause to be made securities transactions that were motivated by the substance of the information.

144.   Upon information and belief, Hanratty further aided and abetted Carr's breaches of fiduciary duty by trying to conceal them from FINRA and others.

145.   Hanratty was a knowing participant in Carr's breaches of his fiduciary duty in that she knew, among other things, that she was (i) receiving non-public information from Carr; (ii) using such non-public information to purchase HPS stock (using Carr's funds); (iii) naming Carr as a beneficiary to the account; and (iv) upon information and belief, working in concert with Carr to conceal Carr's disclosure of non-public information and their purchase of HPS stock in reliance thereon.

146.   HPS has been harmed by Carr's breaches of his fiduciary duty, which Hanratty aided and abetted.

147.   Alternatively, even if HPS was not harmed, it is permitted to bring a *Brophy* action against Hanratty for aiding and abetting Carr in breaching his fiduciary duty.  *See, e.g.*, *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949); *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

148.   HPS is entitled to disgorgement of any illicit profits that Carr and Hanratty obtained through their improper and unlawful insider trading scheme.

149.   HPS is also entitled to recover from Hanratty all of the fees, costs and expenses it incurred as a result of Hanratty's conduct.

## COUNT THREE – BREACH OF THE DUTIES OF
## LOYALTY, TRUST  AND GOOD FAITH
## (AGAINST DEFENDANT CARR) (DELAWARE LAW)

150.   HPS repeats and re-alleges Paragraphs 1 through 149 above as if fully stated herein.

151.   Carr, as an officer and director of HPS (then a Delaware corporation), owed HPS the duties of loyalty, trust and good faith.

152.   The duty of loyalty in Delaware "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993). Indeed, "'[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests'.  Nor can fiduciaries 'intentionally act[] with a purpose other than that of advancing the best interests of the corporation'." *CSH Theaters, LLC v. Nederlander of San Francisco Associates*, 2018 WL 3646817, at *27 (Del. Ch. July 31, 2018) (internal citations omitted).

153.   Officers and directors of Delaware corporations owe a duty of good faith.  *See, e.g., OTK Associates, LLC v. Friedman*, 85 A.3d 696, 723 (Del. Ch. 2014) (discussing the duty of good faith).  "A failure to act in good faith may be

shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

154.   Carr breached his duties of loyalty, trust and good faith by, among other things,: (i) providing false information to HPS in response to its (and FINRA's) investigations into trading of HPS stock before Global's acquisition of HPS was publicly announced; (ii) failing to disclose to HPS the fact that he provided material, non-public information (and funds) to Hanratty when he had an obligation to do so; and (iii) upon information and belief, scheming and/or conspiring with Kelly Carr-Thewes, an HPS attorney, to conceal his improper and unlawful conduct from HPS.

155.   In December 2015, and again in March 2016, FINRA contacted HPS to investigate trading in HPS stock during the weeks leading up to the December 15, 2015 public announcement of Global's acquisition of HPS.

156.   FINRA's initial December 2015 investigation required that HPS identify all individuals who had knowledge of the Global/HPS transaction before it was publicly announced on December 15, 2015.

157.   Specifically, On December 24, 2015, FINRA sent HPS a letter seeking information about "trading in [HPS] common stock" surrounding rumors of the Global-HPS merger "and the announcement of that transaction on December 15, 2015." The letter stated that the "Office of Fraud Detection and Market Intelligence of FINRA is conducting a review of" such trading, and sought information regarding all persons who "participated in or were privy to information about" Global's acquisition of HPS "prior to its public dissemination."

158.   On January 8, 2016, HPS informed Carr of FINRA's investigation into trading in HPS stock leading up to the public announcement of Global's acquisition of HPS and asked him to identify those persons whom he provided information about the Global/HPS transaction before it was publicly announced.

159.   Although Carr knew that he had disclosed non-public information regarding the Global/HPS transaction to Hanratty before December 15, 2015, Carr failed to identify Hanratty even though (and likely because) he knew that HPS was seeking the information in order to respond to a FINRA investigation.

160.   Carr knowingly misrepresented the truth to HPS (and FINRA) when he failed to identify Hanratty as a person who had non-public knowledge of Global's offer to acquire HPS before December 15, 2015.

161.   Carr's failure to identify Hanratty in response to HPS' direct inquiries violated Carr's duties of loyalty, trust and good faith.

162.    Carr further breached his duties of loyalty, trust and good faith when, in response to HPS' inquiry, he failed to inform HPS that he also disclosed material, non-public and confidential information about Global's acquisition of HPS to Elizabeth Chamberlain, Ann Barrett and potentially others.

163.    Carr further violated his duties of loyalty and good faith when he failed to disclose to HPS that he had provided Hanratty with material, non-public information (and funds to purchase HPS stock based on that information) when he had an obligation and duty to do so.

164.    In or about late March 2016, FINRA made a second inquiry with HPS regarding suspicious trades leading up to the public announcement of Global's acquisition of HPS.

165.    Specifically, on March 29, 2016, FINRA sent HPS a follow-up letter regarding its investigation into "trading in [HPS] common stock" leading up to the public announcement of Global's acquisition of HPS.  This follow-up letter, also from the "Office of Fraud Detection and Market Intelligence," included a list of "certain individuals/entities" whom FINRA "staff has identified," and sought information from HPS's officers and directors about those individuals.

166.    The list referenced in Paragraph 165 above included Hanratty.

167.    The information FINRA sought included "a detailed description of any past or present relationship between the persons at [HPS] and the individuals on the enclosed list," a "synopsis of any contact which occurred during the period

35

of October 15, 2015 through December 15, 2015," and "a statement as to the circumstances under which any knowledge of [HPS's] and/or [Global's] business activities may have been gained by the individual."

168.   On April 19, 2016, before the acquisition closed, HPS informed Carr in writing of FINRA's March 29 follow-up letter and provided him with the list of persons FINRA's "staff ha[d] identified," *i.e.*, Carr received the list of persons on whose trades FINRA was focusing.

169.   As set forth above, Hanratty's name was on FINRA's list.

170.   HPS asked Carr to "review the list and identify any individuals or entities with whom you have a relationship."  HPS also told Carr that, for any individuals he knew, he needed to complete a spreadsheet seeking a description ofthe "[n]ature and history of your relationship," a "[s]ynopsis of contact that occurred between October 15, 2014 through December 15, 2016," and a "[s]tatement as to any circumstances under which any knowledge of [Heartland's] and/or [Global's] business activities may have been gained [by] this individual."

171.   The very next day, Carr emailed Hanratty and told her, "We need to chat tonight – about FINRA. FINRA is researching stock purchases prior to Dec 15th."  Hanratty asked, "What is FINRA?"  Carr responded, "Financial Industry Regulatory Authority – they are investigating about 100 people who purchased shares before the announcement of the Global-HPY merger."

172.    When Carr provided HPS with his response to FINRA's March 29 letter, he identified Hanratty as "a close friend," but falsely stated that he did not discuss the HPS/Global transaction with Ms. Hanratty prior to the December 15th Announcement and did not know if Ms. Hanratty had knowledge or awareness of the discussions between HPS and Global, and, if so, how such knowledge or awareness was obtained.

173.    Carr's affirmative misrepresentations to HPS constituted breaches of his duties of loyalty, trust and good faith.  Carr's failure to disclose his violations of HPS' insider trading policies and federal securities laws, when he had a duty and obligation to disclose such information, also constituted breaches of his duties of loyalty, trust and good faith.

174.    Upon information and belief, Carr also schemed and/or conspired with his daughter, Kelly Carr-Thewes (then an in-house attorney for HPS), to conceal his unlawful conduct and breaches from HPS.

175.    On April 12, 2016, HPS sent Carr-Thewes a letter asking for information regarding the list of people identified by FINRA staff in connection with its investigation of trading surrounding the Global-HPS acquisition.  The list Carr-Thewes received included Hanratty.

176.    The letter asked Carr-Thewes to "review the list and identify any individual or entities with whom you have a relationship," and, for any identified person, to provide a "[s]ynopsis of contact" between October and December 2015

and a "[s]tatement as to any circumstance under which any knowledge of HPY and GPN's business activity may have been gained [by] this individual."

177.   Carr-Thewes knew Hanratty, her father's long-time girlfriend, well.

178.   Carr-Thewes and Hanratty repeatedly had dinner together, spent Thanksgiving and Christmas 2015 together, and traveled to Barbados together in March 2016, just weeks before Carr-Thewes received the FINRA letter.

179.   Yet, in response to HPS' April 12, 2016 inquiry, Carr-Thewes falsely stated, "The only person I recognize here is Kathryn Hollis."  That is, Carr-Thewes falsely claimed that she did not even recognize Hanratty's name.  Given that the FINRA list was in alphabetical order, Carr-Thewes presumably saw Hanratty's name given that it was listed *before* Hollis' name.

180.   Upon information and believe, Carr-Thewes provided HPS with false information at the request, direction and/or instruction of Carr.

181.   Carr's misrepresentations to HPS and FINRA about his disclosures to Hanratty were not an oversight or trivial omission.  Rather, they were intentional and designed to conceal the truth of his unlawful conduct from HPS and FINRA.

182.   Relying on Carr's (and Carr-Thewes') representations, and unaware that Carr was concealing the truth, on April 21, 2016, HPS informed FINRA that Carr "did not discuss the HPY/GPN transaction with Ms. Hanratty prior to the December 15th Announcement" and he did "not know if Ms. Hanratty had

knowledge or awareness of the discussions between HPY and GPN, and, if so, how such knowledge or awareness was obtained."

183.   As described in detail in Paragraphs 10 through 61 above, which are incorporated herein by reference, Carr further breached his duties of loyalty, trust and good faith by, among other things,: (i) improperly disclosing HPS' material, non-public, and confidential information to Hanratty and others and (ii) improperly using material, non-public and confidential information for his and Hanratty's personal benefit (tangible and/or intangible).

184.   More specifically, Carr breached his duties of loyalty, trust and good faith when he improperly disclosed to Hanratty and improperly used for his and Hanratty's personal benefit the following material information before it was publicly available and at a time when Carr had a duty to maintain its confidence:

a.   Global's interest in acquiring HPS;

b.   Global's initial offer to acquire HPS for $97.50/share;

c.   The initial targeted signing date for the acquisition; and

d.   Global's subsequent offer to acquire HPS for $97.50/share.

*See* Exs. A-L.

185.   Carr further breached his duties of loyalty, trust and good faith to HPS and engaged in insider trading by:

a.   Tipping and otherwise providing Hanratty with material, non-public and confidential information about HPS (*i.e.*, details about the timing and amount of

Global's offer to acquire HPS) to be used in making securities transactions;

b.   Sending Hanratty an out-of-state check for the purpose of using the funds to purchase HPS stock before Global's acquisition of HPS stock was publicly announced; and

c.   Participating, facilitating and assisting Hanratty in trading in HPS' securities using HPS' material, non-public and confidential information.

186.   On July 10, 2018, the SEC brought a civil action against Carr and Hanratty for "insider trading."  *See* Complaint, Dkt. 1, *SEC v. Carr*, No. 13:18-cv-1135 (D. Conn. July 10, 2018) ("SEC Action"), attached hereto as Exhibit P.  In its Complaint, the SEC alleged, *inter alia*, that (i) "Carr shared material, nonpublic information about the potential acquisition of Heartland by Global with Hanratty at various times"; (ii) "[t]hereafter, on November 15, 2016, Carr provided Hanratty a check for $1 million and instructed her to use that money to open a brokerage account and purchase $900,000 worth of Heartland stock"; (iii) "Hanratty acquired the Heartland securities as instructed by Carr, completing the purchases of Heartland stock weeks prior to the news of the acquisition of Heartland by Global became public"; (iv) "eventually sold the stock for a profit of over $250,000" and (v) that "[b]y knowingly or recklessly engaging in [such] conduct, Carr and Hanratty violated Section 10(b) of the Securities Exchange Act of 1934."  *Id.* ¶¶ 2-3.

187.   On October 2, 2018, the SEC and Hanratty jointly moved the Court to enter a Judgment against Hanratty.  *See* Consented to Motion for Approval of Settlement and Entry of Final Judgment as to Katherine Hanratty, SEC Action, attached hereto as Exhibit Q.  As part of that motion, Hanratty consented:

(a)   "to pay disgorgement in the amount of $250,628";

(b)   "to pay a civil penalty in the amount of $250,628";

(c)   to "not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis."

*Id.* at Dkt. 22-1.

188.   On February 26, 2019, the Court denied Carr's Motion to Dismiss in the SEC action, and in so doing stated the following:

\*   "So [Carr's] argument at that point seems to be on November 9, when he discloses the material information, he didn't expect or reasonably expect that Hanratty was going to trade at the time. I think the problem with that is having disclosed the material information and then soon thereafter providing her with the ability to trade on that information by giving her a million dollars, **I think a strong inference arises that he had the requisite scienter at the time of the tip.**" *See* February 26, 2019

Telephonic Hearing Transcript ("2/26/19 Hearing Tr."), Dkt. 43, SEC Action, at 8, attached hereto as Exhibit R (emphasis added).

\* "You know, the problem here is when she says 'I'm following your advice to the letter,' it suggests that there have been communications that are consistent with her purchase of the stock. They're not perhaps in emails, perhaps they don't have them yet, **but the strong inference here is that this was not only expected but perhaps even planned as a way of creating some financial security for Ms. Hanratty through the increase in the stock price that was anticipated, that was known to be happening.**" *Id.* at 10 (emphasis added).

\* "[F]rankly, **it's a strong case of scienter.** You know, it's very difficult in an insider trading case to come up with much to support it. **Here there is a great deal of suspicious activity and communications that suggest that the scienter existed at the time of the tip**." *Id.* at 11 (emphasis added).

189. On March 22, 2019, the SEC and Carr jointly moved the Court to enter a Judgment against Carr. *See* Apr. 22, 2019 Consented to Motion for Approval of Partial Settlement and Entry of Judgment as to Robert Carr, Dkt. 44, SEC Action, attached hereto as Exhibit S. In connection with that motion, Carr executed a Consent of Defendant Robert O. Carr, pursuant to which he agreed:

42

(a)     "to pay a civil penalty in the amount of $250,628";

(b)     to be "permanently restrain[ed] and enjoin[ed] [] from

violation of Section 10(b) of the Securities Exchange Act;

(c)     to allow the Court to "determine whether it is appropriate to

order that [he] be prohibited from acting as an officer or

director" of a publicly-traded company; and

(d)     to "be precluded from arguing that he did not violate the federal

securities laws as alleged in the Complaint" in connection with

the SEC's motion for a civil officer and director bar.

*Id.* at Dkt. 44-2, SEC Action (Consent of Defendant Robert O. Carr).

190.   Had Carr been loyal, honest and acted in good faith, and had he not

misrepresented his knowledge and conduct, HPS, in January of 2016, and certainly

by no later than April 21, 2016, would have learned of Carr's violations of federal

securities laws and breaches of HPS' insider trading policies.[7]  And, as a result,

HPS would have terminated Carr for cause at that time; *i.e.*, before the April 22,

2016 closing of Global's acquisition of HPS.

191.   Had HPS learned of Carr's unlawful conduct and thus terminated him

for cause, then, before Global's acquisition of HPS closed on April 22, 2016 (and

thus before the Merger Agreement was fully and finally effectuated), Carr's

_____

[7] If Carr was honest and acted in good faith in April 2016, HPS would have also
learned that Carr provided false information to HPS in response to its January 2016
inquiries regarding disclosure of Global's acquisition before it was made public.

outstanding stock awards would have terminated and/or Carr would have forfeited any unvested stock.

192.   Thus, if Carr had not breached his duties of loyalty, trust and good faith, Carr would have forfeited all of the unvested stock compensation awards that vested on April 22, 2016, when Global's acquisition of HPS closed.  Those awards were worth more than $50 million.  Thus, but for Carr's misrepresentations and breaches of his duties of loyalty and good faith, Carr would not have been able to reap the substantial financial rewards he obtained from his stock compensation awards vesting at the closing; *i.e.*, Carr's breaches proximately caused him to obtain financial rewards he should not have received.

193.   In addition, had Carr not breached his duties of loyalty and good faith, before the April 22, 2016 closing of Global's acquisition of HPS, and before the merger agreement was fully and finally effectuated, Carr would have forfeited his stock compensation awards that vested in December 2015, as well as the salary and bonuses he received in 2015 and 2016 before the closing.  That compensation exceeded $10 million.

194.   Further, had Carr not breached his duties of loyalty and good faith, Carr would have not received the over $1 million he received in severance and bonus after Global's acquisition of HPS closed on April 22, 2016.

195.   Carr's breaches of his duties of loyalty and good faith not only allowed him to reap illicit profits, but also caused HPS harm.  Among other harm,

HPS (i) paid Carr salary, bonuses and other compensation to which he was not entitled; (ii) paid payroll taxes it would have otherwise not been required to pay had Carr been terminated for cause; (iii) lost the ability to recoup tens of millions of dollars in stock compensation expense had Carr been terminated for cause; and (iv) incurred attorneys' fees and expenses responding to FINRA, SEC and DOJ inquiries relating to Carr's unlawful conduct.

196.   Additionally, because Carr breached his duty of loyalty and was faithless, he must disgorge any compensation he received during the time for which he breached his duties of loyalty and good faith, regardless of whether Carr's conduct harmed HPS.

## COUNT FOUR – EQUITABLE FRAUD
## (AGAINST DEFENDANT CARR)

197.   HPS repeats and re-alleges Paragraphs 1 through 196 above as if fully stated herein.

198.   As an officer and director of HPS, Carr had a pecuniary duty to provide truthful and accurate information to HPS.

199.   Despite that duty, Carr supplied HPS with false and inaccurate information.

200.   Among other things, Carr supplied HPS with false and inaccurate information regarding (i) the nature and scope of his relationship with Hanratty; (ii) his provision of material, non-public information regarding Global's

acquisition of HPS to Hanratty, Elizabeth Chamberlain, Ann Barrett and potentially others; and (iii) his provision of funds to Hanratty to purchase HPS securities using HPS' material, non-public and confidential information.

201.   Upon information and belief, Carr also schemed and/or conspired with his daughter, Kelly Carr-Thewes, to supply HPS with false information regarding her knowledge of Hanratty in an effort to conceal Carr's unlawful conduct.

202.   Carr failed to exercise reasonable care in communicating with HPS regarding the nature and scope of his relationship with Hanratty; his provision of material, non-public information to Hanratty (and others) regarding Global's acquisition of HPS before that acquisition was publicly announced; and his provision of funds to Hanratty to purchase HPS securities using HPS' material, non-public and confidential information.

203.   Carr deliberately concealed material facts from HPS, and made material misrepresentations to HPS, about: (i) the nature and scope of his relationship with Hanratty; (ii) his disclosure of material, non-public information to Hanratty regarding Global's acquisition of HPS; (iii) his providing Hanratty with approximately $1 million to purchase HPS securities; and (iv) his discussions and involvement with Hanratty's purchase of HPS securities after she received material, non-public information from Carr regarding Global's acquisition.

204.   Carr had a duty to disclose to HPS each of the facts set forth in Paragraph 203 above, but failed to do so.

205.   Had Carr been honest, and had he not acted fraudulently, HPS, in January of 2016, and certainly by no later than April 21, 2016, would have learned of Carr's violations of federal securities laws and breaches of HPS' insider trading policies.[8]  And, as a result, HPS would have terminated Carr for cause at that time; *i.e.*, before the April 22, 2016 closing of Global's acquisition of HPS.

206.   Had HPS learned of Carr's unlawful conduct and thus terminated him for cause, then, before Global's acquisition of HPS closed on April 22, 2016 (and thus before the Merger Agreement was fully and finally effectuated), Carr's outstanding stock awards would have terminated and/or Carr would have forfeited any unvested stock.

207.   Thus, if Carr had not breached his duties of loyalty and good faith, Carr would have forfeited all of the unvested stock compensation awards that vested on April 22, 2016, when Global's acquisition of HPS closed.  Those awards were worth more than $50 million.  Thus, but for Carr's misrepresentations and breaches of his duties of loyalty and good faith, Carr would not have been able to reap the substantial financial rewards he obtained from his stock compensation awards vesting at the closing; *i.e.*, Carr's breaches proximately caused him to obtain financial rewards he should not have received.

---

[8] If Carr was honest and acted in good faith in April 2016, HPS would have also learned that Carr provided false information to HPS in response to its January 2016 inquiries regarding disclosure of Global's acquisition before it was made public.

208.   In addition, had Carr not breached his duties of loyalty and good faith, before the April 22, 2016 closing of Global's acquisition of HPS, and before the merger agreement was fully and finally effectuated, Carr would have forfeited his stock compensation awards that vested in December 2015, as well as the salary and bonuses he received in 2015 and 2016 before the closing.  That compensation exceeded $10 million.

209.   Further, had Carr not breached his duties of loyalty and good faith, Carr would have not received the over $1 million he received in severance and bonus after Global's acquisition of HPS closed on April 22, 2016.

210.   Carr's breaches of his duties of loyalty and good faith not only allowed him to reap illicit profits, but also caused HPS pecuniary loss.  Among other harm, HPS (i) paid Carr salary, bonuses and other compensation to which he was not entitled; (ii) paid payroll taxes it would have otherwise not been required to pay had Carr been terminated for cause; (iii) lost the ability to recoup tens of millions of dollars in stock compensation expense had Carr been terminated for cause; and (iv) incurred attorneys' fees and expenses responding to FINRA, SEC and DOJ inquiries relating to Carr's unlawful conduct.

## COUNT FIVE – FRAUD
## (AGAINST DEFENDANT CARR)

211.   HPS repeats and re-alleges Paragraphs 1 through 210 above as if fully stated herein.

212.   As an officer and director of HPS, Carr had a duty to provide accurate information to HPS.

213.   As set forth above, in response to HPS' inquiries in January and April of 2016, Carr knowingly and intentionally made false representations to HPS regarding the nature and scope of his relationship with Hanratty, falsely informed HPS that he did not provide Hanratty with material, non-public information regarding Global's acquisition of HPS and failed to disclose that he provided Hanratty with funds to purchase HPS securities based on HPS' material, non-public and confidential information.

214.   Upon information and belief, Carr also schemed and/or conspired with his daughter, Kelly Carr-Thewes, to provide HPS with false information regarding her knowledge of Hanratty in an effort to conceal Carr's unlawful conduct.

215.   Despite having a duty to disclose to HPS any suspected or known violations of HPS' insider trading policies, HPS' confidentiality policies, or federal securities laws, Carr intentionally and knowingly choose not disclose to HPS that (i) he provided Hanratty with material, non-public information regarding Global's acquisition of HPS; (ii) he, shortly thereafter, provided her with roughly $1 million, which she used to purchase HPS securities before Global's acquisition of HPS was publicly announced; and (iii) he facilitated, assisted and/or coordinated Hanratty's purchase of HPS securities using funds and material, non-public information he provided.

216.    Carr knowingly and intentionally provided HPS with false information to ensure that he retained his employment and the compensation he obtained therefrom, including, but not limited to, his salary, bonuses and stock options.  In particular, Carr wanted to ensure that he was not terminated for cause, which would have resulted in him forfeiting his unvested stock options before the closing of Global's acquisition of HPS on April 22, 2016.

217.    Carr provided HPS with false information deliberately or, at a minimum, recklessly.

218.    The false information Carr provided to HPS regarding his insider trading, and the information he concealed from HPS regarding his insider trading, was material to HPS.

219.    Had Carr been honest, and had he not acted fraudulently, HPS, in January of 2016, and certainly by no later than April 21, 2016, would have learned of Carr's violations of federal securities laws and breaches of HPS' insider trading policies.[9]  And, as a result, HPS would have terminated Carr for cause at that time; *i.e.*, before the April 22, 2016 closing of Global's acquisition of HPS.

220.    Had Had HPS learned of Carr's unlawful conduct and thus terminated him for cause, then, before Global's acquisition of HPS closed on April 22, 2016 (and thus before the Merger Agreement was fully and finally effectuated), Carr's

---

[9] If Carr was honest and acted in good faith in April 2016, HPS would have also learned that Carr provided false information to HPS in response to its January 2016 inquiries regarding disclosure of Global's acquisition before it was made public.

outstanding stock awards would have terminated and/or Carr would have forfeited any unvested stock.

221.   Thus, if Carr had not breached his duties of loyalty and good faith, Carr would have forfeited all of the unvested stock compensation awards that vested on April 22, 2016, when Global's acquisition of HPS closed.  Those awards were worth more than $50 million.  Thus, but for Carr's misrepresentations and breaches of his duties of loyalty and good faith, Carr would not have been able to reap the substantial financial rewards he obtained from his stock compensation awards vesting at the closing; *i.e.*, Carr's breaches proximately caused him to obtain financial rewards he should not have received.

222.   In addition, had Carr not breached his duties of loyalty and good faith, before the April 22, 2016 closing of Global's acquisition of HPS, and before the merger agreement was fully and finally effectuated, Carr would have forfeited his stock compensation awards that vested in December 2015, as well as the salary and bonuses he received in 2015 and 2016 before the closing.  That compensation exceeded $10 million.

223.   Further, had Carr not breached his duties of loyalty and good faith, Carr would have not received the over $1 million he received in severance and bonus after Global's acquisition of HPS closed on April 22, 2016.

224.   Carr's breaches of his duties of loyalty and good faith not only allowed him to reap illicit profits, but also caused HPS harm.  Among other harm,

HPS (i) paid Carr salary, bonuses and other compensation to which he was not entitled; (ii) paid payroll taxes it would have otherwise not been required to pay had Carr been terminated for cause; (iii) lost the ability to recoup tens of millions of dollars in stock compensation expense had Carr been terminated for cause; and (iv) incurred attorneys' fees and expenses responding to FINRA, SEC and DOJ inquiries relating to Carr's unlawful conduct.

**COUNT SIX – BREACH OF CONTRACT**
**(NON-COMPETE/NON-SOLICIT)**
**(AGAINST DEFENDANT CARR) (NEW JERSEY LAW)**

225.   HPS repeats and re-alleges Paragraphs 1 through 224 above as if fully stated herein.

226.   The electronic payment processing industry is highly competitive. Indeed, processing companies, like HPS, vigorously compete for merchants to use their processing services and to purchase or lease their processing equipment. Thus, the relationships and goodwill that HPS builds and maintains with its customer base are valuable assets, as are the relationships that HPS builds with its sales and other employees, who are critical to implementing the company's business plans and maintaining and expanding the company's customer base.

227.   To preserve and protect its goodwill, reputation, and business and employee relationships, HPS required Carr to  execute a May 4, 2007 Amended and Restated Employee Confidential Information and Noncompetition Agreement, a true and correct copy of which is attached hereto as Exhibit N.

228.   On May 11, 2009, Carr signed Amendment No. 1 to Amended and Restated Employee Confidential Information and Noncompetition Agreement, a true and correct copy of which is attached hereto as Exhibit O.  That agreement, along with the May 4, 2007 agreement referenced in Paragraph 229 above, are referred to throughout this Complaint as the "Agreement."[10]

229.   Paragraph 5(a) of Carr's Agreement contains a non-compete covenant that prohibited Carr, for twelve months after leaving HPS (*i.e.*, until April 22, 2017), from, among other things, directly or indirectly "developing products or services which compete with the products or services marketed, sold or being developed" by HPS.  *Id.* ¶ 5(a).

230.   Specifically, Section 5(a) states:

During the Restricted Period (as defined below), **Employee will not (i) directly or indirectly engage in any business or activity which markets, sells or is developing products or services which compete with the products or services marketed, sold or being developed by the Company at the time of such termination** (such business or activity being hereinafter sometimes called a "Competing Business"), in any country, state, territory, region or other geographic area, whether in the United States or otherwise, in which, at the time the Employee becomes no longer employed by the Company, the Company transacts business or sells or markets its products or services, whether such engagement by the Employee shall be as an officer, principal, agent, director, owner, employee, partner, affiliate, consultant or other participant in any Competing Business, or (ii) assist others in engaging in any Competing Business in any manner described in the foregoing clause (i).

---

[10] The May 4, 2007 agreement revoked and terminated a November 2001 Employee Confidential Information and Noncompetition Agreement.  *See* Ex. N at 1 ("the Company and Employee desire to revoke and terminate the Old Agreement and enter into this Agreement.").

*Id.* (emphasis added).

231.    The Agreement defines the "Restricted Period" as:

(c) "Restricted Period" shall mean the period commencing on the date hereof and ending on the last date of the twenty fourth (24th) full calendar month following the Employee's termination for any reason whatsoever including but not limited to involuntary termination (with or without Cause) and/or voluntary termination; provided that the Restricted Period shall be extended by any amount of time that the Employee has failed to comply with his promises contained in Section 5 of this Agreement; provided further that in the event of a Change in Control the Restricted Period shall mean the period commencing on the date hereof and ending on the last day of the twelfth (12th) full calendar month following the Employee's termination for any reason whatsoever including but not limited to involuntary termination (with or without Cause) and/or voluntary termination following a Change in Control.

Ex. O ¶ 5(c).

232.    Carr's non-competition term makes clear that "the Restricted Period shall be extended by any amount of time that the Employee has failed to comply with his promises contained in Section 5 of this Agreement." Thus, the Restricted Period in Carr's non-competition should be extended for a time period equal to the period that he was in breach.

233.    Carr's Agreement also contains restrictive covenants that prohibit him, for a period of twenty-four (24) months from the end of this employment (*i.e.*, until April 22, 2018), from inducing HPS employees to terminate their employment with HPS or work for a competing business, such as Carr's new business Beyond. Ex. N ¶ 6. Specifically, Paragraph 6(b) states:

54

(b)      **During the period commencing on the date hereof and ending on the last day of the twenty-fourth (24th) full calendar month following the Employee's termination** for any reason whatsoever, including but not limited to involuntary termination (with or without Cause) and/or voluntary termination, **the Employee will not, directly or indirectly, induce other employees of the Company to terminate their employment with the Company or engage in any Competing Business**.

*Id.* (emphasis added).

234.   The Agreement also prohibits Carr from soliciting HPS' merchants and vendors for a period of twenty-four months after his employment with HPS ends.  Ex. O ¶ 6(a).

235.   By executing the Agreement, Carr acknowledged that the restrictive covenants (*i.e.*, the non-compete and non-solicit covenants) do not "prevent him from earning a living" and that the compensation he received was sufficient consideration for the prohibitions contained within the restrictive covenants:

The Employee understands that the foregoing restrictions may limit his ability to earn a livelihood in a business competitive to the business of the Company, but he nevertheless believes that **he has received and will receive sufficient consideration and other benefits in connection with the Company's issuance of certain stock and stock options to the Employee as well as other benefits to clearly justify such restrictions which, in any event (given his education, skills and ability), the Employee does not believe would prevent him from earning a living.**

Ex. N ¶ 5(b) (emphasis added).

236.   By executing the Agreement, Carr also acknowledged that the restrictive covenants contained therein are reasonable and necessary to protect HPS' legitimate business interests:

The Employee acknowledges that the Company has expended considerable resources to develop the confidential information and the relationships that the Company enjoys with its customers, suppliers, employees, officers and other agents, and these assets of the Company are critical to the business of the Company. The Employee agrees that the restrictions set forth below are necessary to prevent even the inadvertent disclosure of this confidential information or the interference with these relationships and to protect the legitimate business interests of the Company and are reasonable in scope and content.

*Id.* ¶ 3(b) (emphasis added).

237.   Carr's Agreement with HPS is a valid and binding contract.

238.   HPS has materially performed its obligations under the Agreement.

239.   HPS, as the successor to Heartland Payment Systems, Inc., has the right to enforce the Agreement.  *Id.* ¶ 10(g) ("The Company may assign any of its rights under this Agreement to any successor entity to the Company, including, but not limited to, any entity formed by the Company to carry on the business of the Company.").

240.   The restrictive covenants in Carr's Agreement survived his termination from HPS.

241.   Carr re-affirmed the restrictive covenants in his Agreement both during and after HPS' acquisition by Global.

242.   Although Carr's Agreement prohibited him from "directly or indirectly engag[ing] in any business or activity which . . . is developing products or services which compete with the products or services marketed, sold or being developed by [HPS]" until April 22, 2017 (*i.e.*, one year from the date he left HPS)

56

(the "Non-Competition" provision), within a few weeks of leaving HPS, Carr

began actively engaging in activities to form and develop Beyond, a new company

that directly competes with HPS.  *See* Exs. N ¶ 5(a).

243.   Indeed, in an April 20, 2017, conference call hosted by Nomura

Securities International, Inc., another former HPS employee and a co-founder of

Beyond, Justin "Blaine" Burn, admitted that "as soon as Bob [Carr] left

[Heartland], I left and **since the first of July last year Bob [Carr] and I have**

**been building another company**."  The "company" that Carr and Burn were

building is Beyond, which provides products and services that compete with HPS

and which serves many of the same types of customers as HPS.

244.   Carr violated the Non-Competition provision of his Agreement by

"directly or indirectly" engaging in activities aimed at "developing products or

services which compete with the products or services marketed, sold or being

developed by [HPS]" within twelve (12) months of leaving HPS.  *See* Ex. N ¶ 5(a).

245.   Such activities include, but are not limited to, (i) developing an

electronic and corporate infrastructure to compete with HPS; (ii) developing

products and services to compete with HPS, including products and services

relating to electronic payment processing and payroll; (iii) developing business and

marketing strategies to compete with HPS, including strategies designed to induce

HPS customers to modify or terminate their contracts or business relationships

with HPS and provide their business to Beyond; (iv) creating a compensation plan

to induce HPS employees to terminate their contractual or employment relationships with HPS and work for Beyond; (v) recruiting, inducing and enticing HPS employees to terminate their employment with HPS and to work for Beyond (including, but not limited to, through directly or indirectly funding, creating, developing or managing the opportunityknocks.info website); (vi) hiring former HPS employees; (vii) negotiating and agreeing with banks to serve as sponsor banks for Beyond's payment processing services; and (viii) negotiating and agreeing with vendors to provide products and services to Beyond to be used to compete against HPS.

246.   Further, during the Restricted Period, Carr invested in, purchased (in whole or in part), provided advice, consultation or assistance to, and/or oversaw companies that were developing and/or selling products and services that competed with HPS' products and services.

247.   Carr also breached his non-solicitation covenants, which prohibited him until April 22, 2018, from "directly or indirectly, induc[ing] other employees of [HPS] to terminate their employment with [HPS] or engage in any Competing Business" (hereafter, the "Non-Solicitation" covenant).  *See* Ex. N ¶ 6(b).

248.   Carr has not acted alone in engaging in the unlawful acts described in this Complaint.  Instead, in a deceptive attempt to try to avoid the restrictive covenants in his Agreement, Carr also used, prior to April 22, 2018, the employees, agents, and representatives of his new competing company, Beyond, to

improperly solicit HPS' merchants and to induce HPS employees to leave HPS and join Beyond.  But Carr cannot avoid his restrictive covenants by having used his new competing company as a straw man to engage in acts expressly prohibited by his Agreement.  Indeed, Carr's restrictive covenants make clear that he may not solicit HPS' customers and may not induce HPS' employees "directly **or indirectly**."  *See* Exs. N and O ¶¶ 5 and 6 (emphasis added).

249.   Carr's breaches of the non-competition and non-solicitation provisions in his Agreement have caused, and continue to cause, HPS harm.

250.   Among other harm, HPS paid Carr salary, bonuses and other compensation to which he was not entitled and paid payroll taxes it would have otherwise not been required to pay.  Indeed, HPS did not get the benefit of its bargain.

251.   Carr's non-competition term makes clear that "the Restricted Period shall be extended by any amount of time that the Employee has failed to comply with his promises contained in Section 5 of this Agreement."  Ex. O ¶ 5(c).  Thus, the Restricted Period in Carr's non-competition should be extended for a time period equal to the period that he was in breach.

252.   The public interest is served by preventing Carr from further breaching his Agreement.  Indeed, while HPS will suffer additional harm if injunctive and other appropriate relief is not granted, Carr will suffer no prejudice

if he is required to simply comply with restrictive covenants to which he has already agreed and for which he has already received substantial compensation.

253.   HPS has no adequate remedy at law.[11]

## JURY TRIAL

Global and HPS hereby demand a jury trial in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

1.   That the Court enter judgment in favor of HPS and against Carr on all Counts except Count Two;

---

[11] To be clear, for purposes of this litigation, HPS is not claiming that Carr improperly used or disclosed HPS' confidential information in connection with its claim that Carr breached his non-compete and non-solicitation covenants. That is, HPS does not base, and will not base, its claim that Carr breached his non-compete and non-solicitation covenants on Carr's use or misuse of HPS' confidential information. Rather, HPS can and will succeed on its restrictive covenant claims by showing that Carr (1) "directly or indirectly engage[d] in any business or activity which markets, sells or is developing products or services which compete with the products or services marketed, sold or being developed by the Company at the time of such termination . . . whether such engagement by [Carr] shall be as an officer, principal, agent, director, owner, employee, partner, affiliate, consultant or other participant"; (2) "assist[ed] others in engaging in any Competing Business"; (3) "directly or indirectly, solicit[ed], entic[ed] or induc[ed] any Customer or Supplier of [HPS] to (i) become a Customer or Supplier of any other person or entity engaged in any business activity that competes with any business conducted by [HPS] at any time during the period of [Carr's] employment with [HPS], or any business planned by the Company any time during the period of [Carr's] employment with [HPS], or (ii) cease doing business with [HPS]" or (4) "assist[ed] any person or entity in taking any action described" in (3) above. *See* Exs. N and O ¶¶ 5-6. Thus, HPS' claim that Carr breached his non-compete and non-solicitation covenants is not dependent upon whether Carr used or misused HPS' confidential information.

2.      That the Court enter judgment in favor of HPS and against Hanratty on Count Two;

3.      That the Court order Carr and Hanratty to disgorge any and all profits they made in connection with Carr's breaches of his fiduciary duty and Hanratty's aiding and abetting of that breach; *i.e.*, from their insider trading transactions;

4.      That the Court order Carr and Hanratty to pay HPS all fees, costs and expenses they incurred in addressing, investigating and responding to all subpoenas, regulatory investigations, court proceedings and other actions relating to Carr's insider trading and related conduct;

5.      That the Court enter judgment in favor of HPS and against Carr on Count Three;

6.      That the Court enter an injunction requiring Carr, and those in concert with him, to abide by the terms of his Agreement, including the restrictive covenants;

7.      That the Court extend the Restrictive Period "by any amount of time that [Carr] has failed to comply with his promises contained in Section 5 of [the] Agreement," as set forth in Section 5(c) of the Agreement;

8.      That the Court require Carr to disgorge, forfeit or otherwise pay to HPS all of the compensation or value he received from HPS on or after November 9, 2015, including, but not limited to, the value of the taxable income he realized

from the grant, vesting or sale of any shares obtained pursuant to any stock awards (restricted or performance based) from November 9, 2015 to the present[12];

9.      That the Court award HPS any and all monetary relief to which it is entitled;

10.     That the Court award HPS its attorneys' fees and expenses;

11.     That the Court award HPS pre-judgment and post-judgment interest;

12.     That all costs be assessed against Carr and Hanratty; and

13.     That the Court award such other and further relief as shall it considers just and proper.

---

[12] This specifically includes the taxable income from any HPS unvested shares that vested on April 22, 2016.

DATED: June 3, 2019                    Respectfully submitted,

                                       **NUKK-FREEMAN & CERRA, P.C**.
                                       By: s/*Kirsten McCaw Grossman*
                                       Kerrie R. Heslin
                                       Kirsten McCaw Grossman
                                       Ryan S. Carlson
                                       26 Main Street, Suite 202
                                       Chatham, New Jersey 07928
                                       Telephone: (973) 665-9100
                                       Fax: (973) 665-9101
                                       kheslin@nfclegal.com
                                       kgrossman@nfclegal.com
                                       rcarlson@nfclegal.com

                                       (Admitted *Pro hac vice*):
                                       **BONDURANT, MIXSON &
                                       ELMORE LLP**
                                       Steven Rosenwasser
                                       Patrick C. Fagan
                                       1201 West Peachtree Street NW
                                       Suite 3900
                                       Atlanta, Georgia 30309
                                       Telephone: (404) 881-4100
                                       Fax: (404) 881-4111
                                       rosenwasser@bmelaw.com
                                       fagan@bmelaw.com

                                       *Attorneys for Plaintiff*
                                       Heartland Payment Systems, LLC

## CERTIFICATION

I certify that I have no knowledge of any other action or arbitration involving the matter in controversy, nor have I any knowledge at this time of any additional parties who should be joined in this action.

NUKK-FREEMAN & CERRA, P.C.

s/ Kirsten McCaw Grossman
KIRSTEN MCCAW GROSSMAN

*Attorneys for Plaintiff*

Dated:  June 3, 2019